# Richmond

DELBERT LEWIS v. COMMONWEALTH OF VIRGINIA.

March 10, 1969.

Record Nos. 6875 and 6876.

Present, All the Justices.

*James W. Harman, Jr.; J. K. McFarlane* for plaintiff in error in Record Nos. 6875 and 6876.

*D. Gardiner Tyler, Assistant Attorney General* (*Robert Y. Button, Attorney General*, on brief), for defendant in error in Record Nos. 6875 and 6876.

BUCHANAN, J., delivered the opinion of the court.

Delbert Lewis was charged in two indictments with crimes against nature, that is, having carnal knowledge of the bodies of Dexter Bowling and Donald Bowling. Code § 18.1-212 (1960 Repl. Vol.).* The indictments were tried together to a jury which found defendant guilty as charged in each and fixed his punishment at one year in the penitentiary on each conviction. On September 11, 1967, the court overruled defendant's motion for a new trial and sentenced him according to the verdicts. To those judgments he was granted writs of error. His main contention is that the evidence was not sufficient to prove him guilty.

The Commonwealth's evidence showed that on March 4, 1967, Donald Bowling, aged fourteen, and Dexter Bowling, aged sixteen, brothers, had dinner at the home of their grandfather around 6 p.m. When it was "not hardly" dark the boys walked to a store not more than a mile away, stayed there a short time, and then caught a ride to the town of Cedar Bluff. There they conducted some business at a store known as the Arcade, leaving the store when it "wasn't plumb dark".

Outside the Arcade a car pulled up and the driver "pulled a gun" and forced the boys to get into the car. He drove to a trash dump where he stopped and made the boys completely undress, but upon approach of a car, he had them "duck" down in the seat and he

---

* The offense with which defendant was charged will herein be referred to as sodomy. See *Ashby* v. *Commonwealth*, 208 Va. 443, 444, fn. 1, 158 S.E.2d 657, 658. He was tried under Code § 18.1-212 prior to its 1968 amendment by which the punishment for sodomy was increased if force was proved. See Code § 18.1-212 (1968 Cum. Supp.).

drove to an area known as McGuire Valley. There he forced each brother to commit an act of oral sodomy upon him.

Neither Donald nor Dexter had known defendant prior to March 4, 1967, but both identified him in court as the person who had made them commit the acts.

After the events in McGuire Valley, the boys put on their outer clothing while defendant drove them to a road leading to Raven Nest Branch where he released them. On the way he warned them not to say anything to the police about what had happened or he would come after them. He told them that he had a two-way radio by which he could hear police radio calls and that he had an extra set of license plates for his car. He had Dexter pull a license plate from under the right front seat.

After the boys got out of the car Donald struck a match and Dexter wrote down the number of the license plate on defendant's car on an egg order pad which he carried with him. Donald's pocket watch showed the time to be 9:15 p.m.

The point where they were let out was some four or five miles from the town of Richlands.

The boys then went to the home of their uncle, Walter Asbury, who lived nearby. According to Asbury, sometime after 9 p.m. (he had noticed his clock at 9 p.m.), they came running in "looking kind of white and shaking with their underwear under their arm." Dexter told Asbury what had happened and the uncle took them to the police station in Richlands.

There the boys told what had happened. They said that their assailant had been driving a yellow Corvair and gave its license number. They further described the car as having a damaged right rear door, as containing what the driver had told them was a two-way radio, and as having tools on the rear floorboard and license plates under the right front seat.

Richlands police officer Vencill testified that he was called to the police station about 9:40 p.m. and the incident was reported to him. Upon learning that the car was registered to Leonard Lewis (defendant's father) of Richlands, Vencill went to the Lewis residence and found a white Corvair parked outside. Vencill had the boys brought there to see if they could identify the car. After the Bowling boys arrived, Leonard Lewis and one of his sons came out of the house, but both boys said that the son was not their attacker. When defendant came out on the porch Donald Bowling identified him.

Dexter was not sure at first but after seeing defendant in the headlights of a car he also identified him.

Through the window of the car Vencill observed items corresponding to those described by the boys. While he was unable to see any damage to the right rear door, he later found that the door was hard to open. He asked defendant if he had any extra license plates in the car, and after defendant replied that he did not think so, upon Vencill's request defendant looked under the right front seat and found a set of license plates.

The Bowling boys subsequently showed a State trooper the route which their assailant had followed from where they were picked up until they were let out. The trooper testified that it took him about 30 minutes to drive the route at about 25 miles per hour.

Defendant, aged nineteen, undertook to account, by his own and other testimony, for his whereabouts at the time the offenses were committed. He testified that he arrived home from work about 6 p.m. and remained there until about 7:30 p.m., when he departed to visit used car lots. He arrived at B & G Motors about 7:45, talked with two salesmen for fifteen or twenty minutes, and then was permitted to test drive a Sunbeam automobile. He drove the car home, took his father for a ride, then went to a store to purchase some aspirin for his mother, stayed there for some fifteen or twenty minutes, then went home before returning the car to B & G Motors about 8:30 p.m.

After driving around Richlands for a while he went to the Hill Top Drive-In about 8:45 and remained there until about 9:30, periodically talking with curb girl Linda Griffith. He then went to Ovie's Drive-In, where he talked briefly with Peery Johnson before heading back toward Richlands. Near Ovie's, at the Doran crossing, he was blocked by a train for five or ten minutes. He then drove home, arriving there shortly before 10 p.m.

Defendant's father testified that his son left the house about 7:30 p.m., returned with a test car and took him for a ride, went on an errand for his mother and then left with the test car a little after 8 p.m. The salesmen at B & G Motors testified that defendant took the Sunbeam about 7:25 p.m. and returned with it a little after 8:00. Two employees at the place where defendant purchased the aspirin testified that defendant came there about 7:45 and stayed about half an hour.

Linda Griffith, defendant's second cousin, testified that he came

to the Hill Top Drive-In about 8:45 p.m. and stayed until about 9:30. Peery Johnson testified that he talked with defendant at Ovie's for about five or ten minutes at about 9:30 p.m.; that just after defendant left Ovie's he was blocked by a train.

In rebuttal, the Commonwealth called Richlands police officer Dowdy who testified that about 10:20 p.m., while he was on the lookout for a yellow or light-colored Corvair, he met a white Corvair. After noting its license number he checked with the police station and learned that this car [defendant's] was the one the police were seeking.

Norfolk and Western train dispatcher Duff testified that he was on duty in Bluefield on March 4 from 3 until 11 p.m. Using a record he had made at that time, he testified that a train of 134 cars would have passed the Doran crossing, where defendant said he was blocked, about 10:05 or 10:10. He had already explained how, through the use of an electrical air system, the dispatcher in Bluefield was able to tell on a board where any of the trains in his district were at a given time.

The evidence as to the hours are mainly estimates, and it was for the jury to consider this alibi evidence along with the other evidence in the case. Under all the evidence it was for the jury to determine whether the defendant was guilty of the crimes charged against him, and the evidence was clearly sufficient to support the jury's verdicts.

"* * Where, after a fair trial, a verdict of guilty is returned and judgment is entered thereon, such judgment should only be disturbed when it appears that it is plainly wrong or without evidence to support it. * *" *Miles* v. *Commonwealth*, 205 Va. 462, 467-8, 138 S.E.2d 22, 27.

Defendant asserts, however, that the court erred in admitting and excluding testimony.

■ Walter Asbury, uncle of the Bowling boys, was allowed to testify that when the boys arrived at his home Dexter told him that "a fellow" had made them commit acts of oral sodomy (Asbury quoted Dexter's word which had that meaning). Defendant objected on the ground that this was hearsay.

The Attorney General argues that this testimony did not prejudice the defendant because it did not name the defendant; that it explained the reason for Asbury's making complaint to the police, and that it was a part of the *res gestae*.

We do not agree that it was part of the *res gestae*. It was not a part of the offense under investigation, but something that occurred afterwards. See *Haynes* v. *Commonwealth*, 69 Va. (28 Gratt.) 942, 946; *Pepoon* v. *Commonwealth*, 192 Va. 804, 809, 66 S.E.2d 854, 857.

While a complaint made by the alleged victim of rape is admissible within the limits recently stated in *Herron* v. *Commonwealth*, 208 Va. 326, 329-30, 157 S.E.2d 195, 198, we have declined to extend this rule beyond cases of rape. See *Haynes* v. *Commonwealth* and *Pepoon* v. *Commonwealth*, *supra*.

However, each of these boys had already testified that he had been forced to commit this act of sodomy and had seen his brother forced to commit the act. Proper evidence showed that the boys went to their uncle's home and made complaint to him; that he immediately took them to the police station, where complaint was made to the authorities and an immediate investigation was begun.

Moreover, defendant's defense primarily was not that the offenses had not been committed, but that he was not the person who committed the offenses. Defendant did not refer specifically to this testimony in his assignments of error, and his only reference to it in the argument in his brief was that it was "purely hearsay," that it could not have been part of the *res gestae*, and that it "was improperly admitted, to the prejudice of the defendant."

While the admission of this testimony was technically erroneous, we hold that it was harmless error in this case and not sufficient cause for reversal.

■ Defendant also complains about the admission of certain testimony given by officer Dowdy in rebuttal "on the ground that the Commonwealth had not laid the proper foundation." Defendant was asked on cross-examination whether he recalled meeting a town of Richlands car at the Southwest Tire Company on this night. He replied that he did not, and that there was no car behind him "as far as my rear view mirror could reach." Dowdy then testified in rebuttal that on this night he was on a lookout for a certain Corvair and a car passed him bearing the license number of defendant's car; that he, Dowdy, and the officer with him turned around and tried to overtake it but did not, and that it was about 10:20 when this occurred.

There was no error in admitting this testimony. Furthermore, it contradicted defendant's evidence that he was at home by 10 p.m.

■ ·Defendant sought to introduce by the testimony of his father, Leonard Lewis, some statement by Deputy Sheriff Webb made in the presence of the defendant. The court sustained objection to it on the ground that it would be hearsay; but the court told defendant that he could call Webb if he desired. It had been stated that Webb was available, although he was not present at the trial.

The record does not show what Leonard Lewis would have testified or what the statement by Webb would have been. Without this information it cannot be determined whether such testimony might have been admissible or whether its exclusion was harmful to defendant. See *White* v. *Hunt*, 209 Va. 11, 17, 161 S.E.2d 809, 814.

■ On June 26, 1967, before final judgment, defendant filed a written motion to set aside the verdicts on the ground, among others, of newly-discovered evidence. With the motion he filed ten affidavits. The Commonwealth's attorney filed a reply opposing defendant's motion and with it filed about an equal number of affidavits denying practically all the material statements in defendant's affidavits.

The affidavits filed by defendant included his own in which he stated that since his trial on May 26, 1967, he and his attorneys "have secured certain evidence that was not available to any of them prior to trial, and that the defendant could not have secured such evidence by due diligence prior to the trial of his case for the reason that the same was known only to the law enforcement officers of Tazewell County, Virginia, and the Town of Richlands, and that it was only by·accident that information of this evidence came to the said Delbert Lewis."

Motions for a new trial on the ground of after-discovered evidence are not looked upon with favor in view of the temptation involved. *Moore* v. *Commonwealth*, 186 Va. 453, 464, 42 S.E.2d 871, 876; *Holmes* v. *Commonwealth*, 156 Va. 963, 968, 157 S.E. 554, 556.

In *Reiber* v. *Duncan*, 206 Va. 657, 663, 145 S.E.2d 157, 161-62, the well-settled general principles are stated to be:

"* * Motions for new trials based on this ground are addressed to the sound discretion of the trial judge and are awarded with great reluctance and with special care and caution. The evidence must (1) appear to have been discovered since the trial; (2) be such that in the exercise of reasonable diligence on the

part of the applicant it could not have been secured at the former trial; (3) not be merely cumulative, corroborative or collateral; and (4) be material in its objects, and such as on another trial ought to produce opposite results on the merits. Burks Pleading and Practice, 4 ed., Motions After Verdicts, § 324, p. 602."

In *Fulcher* v. *Whitlow*, 208 Va. 34, 38, 155 S.E.2d 362, 365, after repeating these rules it was said:

"We focus our attention upon the application of the second of the quoted rules, that is, that a party who seeks a new trial on the ground of after-discovered evidence must show that he used reasonable diligence to secure such evidence before the earlier trial. It is not sufficient merely to say that the evidence could not have been discovered by the use of due diligence. The applicant for a new trial must set forth in affidavits facts showing what his efforts were to obtain the evidence and explaining why he was prevented from securing it. 13 Mich. Jur., New Trials, § 27, pp. 649-650; 39 Am. Jur., New Trial, § 163, p. 170."

The affidavit filed by the defendant, quoted above, clearly was not sufficient to meet these requirements, and defendant's motion to set aside the verdicts on this ground was properly refused.

We find no reversible error in the trial and the judgments below are affirmed.

*Affirmed.*