## Richmond

### RANDY LEE ODUM

### v.

### COMMONWEALTH OF VIRGINIA

March 11, 1983.

Record No. 820890.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson,*
Stephenson and Russell, JJ.

---

\* Justice Thompson participated in the hearing and decision of this case prior to the
effective date of his retirement on March 2, 1983.

124

*Charles F. Purcell (Purcell & Purcell,* on brief), for appellant.
*Todd E. LePage, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this criminal appeal, we decide whether the trial court erred in refusing to grant defendant's motion for a new trial based on after-discovered evidence.

Charged in separate indictments with maliciously attempting to cause bodily injury, with intent to maim, disfigure, disable and kill William Kent Tetreault and Darla Jane DeGraide, defendant Randy Lee Odum was convicted in a consolidated jury trial of unlawfully committing the offenses. The trial court confirmed the findings of guilt and imposed consecutive sentences of five years in prison with two years suspended. We awarded defendant an appeal from the February 1982 judgments, and limited the issues.

On April 29, 1981, during daylight about 8:00 p.m., the victims were traveling westbound on a motorcycle in Goochland County. They were on Interstate Route 64 en route from Richmond to Charlottesville. They stopped at a Rest Area so DeGraide could use the restroom. Tetreault remained at the vehicle. As she was was returning to the motorcycle, a 1977 green Ford pickup truck entered the parking area at a high rate of speed. Occupied only by the operator, the truck was driven into the space adjacent to the motorcycle, bouncing off the curb as it stopped 10-15 feet from the victims amid "squealing of tires." The driver, later identified

as defendant, jumped from the truck "in stocking feet." He was cursing and shaking his fist "in general at no one." He ran to a nearby telephone booth, still shouting obscenities.

Worried by the conduct of defendant, a complete stranger, Tetreault quickly drove from the wayside, accompanied by his companion (his wife at the time of trial). After proceeding west on Interstate 64 for several miles, Tetreault observed the truck, driven by defendant, approaching from the rear "at an extremely high rate of speed." Tetreault increased his speed to 65-70 miles per hour but defendant "caught up" nonetheless. As defendant was within 20 feet, driving directly toward the motorcycle, Tetreault took evasive action to avoid being struck, moving abruptly to the "breakdown lane." Defendant pulled in front of the motorcycle and stopped. Anticipating defendant would back over the motorcycle, Tetreault drove quickly onto the travel lanes of the highway to escape the truck.

From that location to a point about six to seven miles farther west, defendant made a series of attempts to run into the motorcycle. During this time, the motorcycle, traveling about 25 miles per hour, was driven by Tetreault from lane to lane to avoid collisions with the pursuing vehicle and was forced into the grass median strip. On several occasions, defendant released the steering wheel of the truck as it was close to the motorcycle, "threw" both arms out of the window, shook his fists at the victims, cursed them, and said, " 'I am going to kill you, you [expletive deleted].' " Finally, with the aid of passing motorists, Tetreault was able to escape defendant, exit the Interstate, and proceed to his destination by another route. The victims had memorized the license number of the truck, which led to defendant's arrest.

At trial, the central factual issue was the accuracy of the identification of defendant as the criminal agent. The truck was registered in the name of defendant's brother, Fred Odum. The accused denied being the driver of the truck at the time in question.

Fred Odum, present at trial, resembled his accused brother. According to the record, defendant was of medium build, five feet ten inches tall, had very long "blondish red" hair tied in a pony tail, had a bushy beard, and wore glasses. At the time of the offense he wore a khaki cap, a khaki shirt, khaki pants, and white socks. Fred Odum appeared at trial wearing a beard, glasses, and khaki clothing; he was described as "very husky," with long light brown hair tied in a pony tail.

Tetreault and DeGraide repeatedly and positively identified defendant to the jury as the perpetrator of the crimes, based on their observations of him at the Rest Area and during the highway incidents. Tetreault said, "I was within six feet of [defendant] at several points during our exchange and I got a very good look at him." He further testified, "he was very close to me when we were in the rest area . . . so there is no doubt in my mind." Tetreault, a registered nurse at the University of Virginia Hospital, previously had seen Fred Odum who was being treated at the hospital for a gunshot wound. Noting he had "a good look" at Fred then, Tetreault identified defendant as the assailant. When asked during the trial to point out distinguishing features between Fred and defendant, Tetreault said, "I see a strong family resemblance but I wouldn't say they look alike." He stated their body shapes, coarseness of beards, length of hair, and facial features were different, noting, "I was able to get a good look at both gentlemen on different occasions."

DeGraide testified, having only seen Fred Odum at court on the day of trial, that she had "[n]o doubt" defendant was operating the truck at the time in question. She said she observed him during "[a] couple of minutes" at the Rest Area and several times on the highway when "he had most of the upper half of his body hanging out of the driver's side of the truck" screaming "I am going to kill you." At the time the motorcycle was traveling "very slow," she said.

The brothers were the only witnesses called to testify at trial for the defense. Fred, a resident of Amelia County and employed in Richmond, stated he was living in Louisa County on April 29, the day in question. Fred, a convicted felon, testified he operated his truck that day but did not know where the vehicle was at 8:00 p.m. Under questioning by the trial judge, he said, during a series of evasive answers, that he told the investigating police officer the day after the offense that he "didn't recall" where his truck had been on the previous day and that he "may have" told the officer the defendant was using the truck when the incident occurred.

The defendant, a resident of Amelia County, testified he didn't "usually" borrow his brother's truck, but stated, "I have driven it." Although denying he drove the truck in Goochland County on April 29, defendant could not recall his whereabouts on that day. He said that at the time of his arrest two days after the incident,

he had no "real" recollection of his activities on the day in question.

The verdicts were rendered on November 5, 1981, and sentencing was postponed pending receipt of a probation officer's report. Seven days later, defendant filed a motion to set aside the verdicts and grant a new trial. The ground of the motion was that newly discovered evidence had become available since the trial in that Fred Odum had "confessed" on November 9. On that day, according to the motion, Odum "confessed" to Lt. Parrish of the Goochland County Sheriff's Department and at the same time signed an affidavit. The brief affidavit was attached to the motion. It recited that Fred Odum was the "only one" who drove his truck on April 29 and that he drove it on Interstate 64 from Richmond to Louisa at about 8:00 p.m. on that day.

The trial court conducted an evidentiary hearing on the motion on November 30. After a lengthy discussion among the court and counsel as to the legal sufficiency of the motion, the trial judge invited defense counsel to put on "any evidence that you wish to present at this time." The Odums' mother, Clara Mae Collier, was called as a witness.

Collier, employed as a manager at "Family Dollar" in Louisa, stated Fred Odum was residing at her Louisa home on April 29. She testified Fred arrived there alone near 8:30 p.m. on that day driving his truck and dressed in khaki work clothes. She stated Odum was "completely out of his mind," yelling and making "a terrible noise." He was under the influence of alcohol and possibly "dope," she said. She stated he wanted to call his brother, Randy, in Amelia "because somebody had done [Fred] an injustice," and he "wanted to go do some fighting."

Collier further testified she learned subsequently that defendant had been charged with the instant offence. She was present at the preliminary hearing when the victims testified and identified defendant as their assailant. She stated she "knew beyond a doubt" that Fred "had really done it because he had told me over and over that night that he had stopped at that phone booth to call his brother." Collier testified she told defendant to tell Fred "that he had to tell the truth" and "admit that it was [Fred] driving the truck and that it was him that had done it even though he was drunk."

Commenting on her failure to appear at the trial, Collier testified that she had "a district meeting" in Richmond on that day

and that she would have lost her job if she had failed to attend. She was not subpoenaed for the trial. She testified that if she had received a summons to show her district manager, she "probably" would not have been fired. Furthermore, Collier said, Fred had informed her that he would confess at the trial and "that everything would be okay." In addition, Collier said she did not go to court because she did not feel there was a chance defendant would be convicted. She said the victims "would know" Fred was the perpetrator and "could tell which was which if they seen them both together." Collier answered, "Well no" to the trial judge's question: "Isn't it a fact in the family that they probably thought [Fred and Randy] looked so much alike that it will be confusing to the jury as well as everybody else"?

Defense counsel called Fred Odum to the stand. At the time, Odum was represented by counsel who was not at the hearing because he was recuperating at home from surgery. Responding to inquiries by the trial judge, Odum stated his attorney "don't want me talking to anybody about the case" and "he didn't know I was going to be on the stand today either." Ruling "it would be unfair to you and your attorney for the court to permit you to testify," the trial judge refused to receive any testimony from Odum.

At the conclusion of the hearing on November 30, the trial judge denied defendant's motion, stating "there is no occasion to have this case retried" and "I'm not open to hearing a further motion from either side on this type of disposition of this case."

Subsequently, the Odum family employed an attorney, who was substituted for defendant's court-appointed lawyer as counsel of record. On February 16, 1982, new counsel filed a second motion for a new trial, assigning Fred Odum's "confession" as grounds for the relief sought. At the outset of the sentencing hearing on February 19, defendant's attorney sought to present evidence in support of the second motion. The trial judge expressed the view that defendant merely was asking the court for rehearing of a previous motion for a new trial. The court refused to permit further testimony, allowed defendant to proffer evidence for the record, and denied the second motion.

On appeal, defendant argues the trial court erred in refusing to order a new trial "in light of the evidence offered in support of the said Motion including the fact of a third party confession [made] after the conviction." Defendant contends Fred Odum "gave perjured or strongly evasive testimony at trial which the defendant

could not predict." He contends that if a jury has the opportunity to hear the facts disclosed in Odum's November 9 detailed "confession" and affidavit, which are "substantially different" from his trial testimony, another trial of defendant would produce opposite results.

The essence of Odum's seven-page "confession," proffered during the February 19 hearing, is that he left a bar in Richmond during the early evening of April 29 after being refused further service because he "was too drunk to drink any more"; he proceeded to his mother's Louisa home via Interstate 64, driving his truck while dressed in his khaki work clothes; he stopped at the Rest Area to call Randy; he observed the motorcycle there; he did not remember the subsequent events as related by the victims but he "believe[s] probably it did happen"; and he "cannot say" he "did not do it." During the "confession," Odum was asked why he failed to "come forward" before trial with the admission. He responded that when the incident occurred he had just finished serving a sentence for "felonious assault"; that another like charge would surely land him in "the slammer"; and that, if he said his brother was driving the truck, probably a mere reckless driving charge would be lodged. As the case "progressed," he said, he "felt certain that [Randy] wouldn't be convicted." Defendant argues that because of Odum's "confession," corroborated by his mother, "a disinterested and impartial witness," the trial court was wrong in denying a new trial. We disagree.

 Motions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance. *Lewis* v. *Commonwealth*, 209 Va. 602, 608, 166 S.E.2d 248, 253 (1969). The applicant bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial. *Fulcher* v. *Whitlow*, 208 Va. 34, 37-38, 155 S.E.2d 362, 365 (1967), citing *Reiber* v. *Duncan*, 206 Va. 657, 663, 145 S.E.2d 157, 161-62 (1965). *Accord Starks* v. *Commonwealth*, 225 Va. 48, 301 S.E. 2d 152 (1983), decided today. Here, three of these mandatory criteria have not been met.

Preliminarily, we must define "the evidence" which supposedly was newly discovered under the circumstances of this case. "The evidence" is not merely the written documents — the affidavit and the seven-page transcript of the question-and-answer interrogation. Rather, "the evidence" is substantive information indicating Fred Odum was the criminal agent.

With this concept in mind, the first requirement was not met in that "the evidence" does not appear to have been discovered after the trial. Indeed, if defendant's mother is to be believed, as defendant urges, she knew immediately after the incident that Fred was operating his truck at the time in question. Also, she says she informed defendant of the alleged fact of Fred's involvement and she urged defendant, prior to trial, to persuade Fred "to tell the truth" and admit he was the culprit. In addition, after listening to the preliminary hearing testimony, she "knew beyond a doubt" Fred was the assailant. Thus, defendant and his mother were armed before the trial with the very information which surfaced after the trial via the "confession."

Second, defendant has not demonstrated the evidence could not have been obtained for use at trial in the exercise of reasonable diligence. Actually, the record affirmatively shows lack of due diligence. While, as defendant argues, he could not force Fred to confess, nevertheless the mother was armed, as was defendant himself, with facts to present to the jury that, if true, would have tended to exonerate defendant by showing Fred to be the perpetrator. The mother was available, within the jurisdiction, and susceptible to subpoena. Yet, she was not served with process and was not present at trial.

Third, while the evidence, if believed, was material, the trial court, assessing the credibility of defendant's witnesses both at trial and at the motion hearing, properly could find that it was not such as should produce opposite results on the merits at another trial. At a future trial, the contents of Odum's "confession" would be only the latest in a series of inconsistent statements. More importantly, the trial court was justified in concluding that because of the positive, credible, largely unimpeached identification of defendant by the victims, the same results would occur upon retrial.

We reject summarily two other contentions of defendant. He complains because the trial court refused to receive evidence on the second motion at the sentencing hearing. At the first motion hearing, defendant was given a full opportunity to present

facts in support of the motion. After defendant offered evidence, the court ruled on the motion, admonishing counsel not to present a further motion raising the same issue. In the face of this ruling, defendant, through new counsel, attempted to have the trial court rehear the matter. There was no abuse of discretion when the court denied the rehearing, particularly in view of the fact that all information proffered on February 19, except polygraph results, was submitted or available at the time the first motion was considered.

■ Finally, defendant on February 19, as noted, proffered the results of polygraph examinations of defendant and Fred Odum, apparently conducted after the first motion hearing. They were made pursuant to written agreements between the respective parties and the Commonwealth's Attorney. The agreements stipulated that either party could introduce the results in any hearing relating to the prosecution of defendant or Fred Odum. The trial court refused to consider the examination results, and correctly so.

In Virginia, results of lie detector tests are not viewed as scientifically reliable, and we have held that the exclusion of such findings, even though favorable to the accused, was proper. *Lee* v. *Commonwealth*, 200 Va. 233, 237, 105 S.E.2d 152, 154-55 (1958). In the present case, we likewise hold that, even though the prosecutor and the accused stipulate to the use of such results, the trial court in the exercise of discretion properly may refuse to consider such inherently unreliable information.

For these reasons, we hold the trial court did not err in refusing to set aside these verdicts and grant a new trial. Consequently, the judgments appealed from will be

*Affirmed.*

RUSSELL, J., dissenting.

I cannot agree with the conclusion reached by the majority. Fred Odum, evidently affected by the pangs of conscience, asked to speak privately with the trial judge immediately after the jury had been discharged. When this request was properly refused, Fred went to Randy's counsel that same evening and disclosed that he had committed perjury at trial and that he had been the driver of the truck at the time in question. The following week he gave a sworn statement, after proper warnings, to a deputy sheriff in the presence of Randy's counsel.

This was, in my view, evidence which on its face meets the four-fold test of *Fulcher* v. *Whitlow*, 208 Va. 34, 155 S.E.2d 362 (1967). (1) It was clearly discovered after trial. (2) It was not available to Randy at trial; as the majority concedes, by no amount of diligence could he have forced his brother to confess.* (3) It was not cumulative, corroborative, or collateral; it went directly to the gravamen of the case and was the only evidence of a criminal agent other than the defendant. (4) It was material and, if believed, would produce opposite results on the merits. It is difficult to imagine evidence more likely to result in acquittal than these admissions by the defendant's brother. This conclusion is strenghtened by the strong resemblance between the two brothers, rendering the victims' identification of Randy less persuasive than might otherwise have been the case. The trial court observed: "The defendant and his brother appeared in this courtroom before the jury dressed almost identically, appearing almost identical . . . ."

My concern is that the court never permitted Fred Odum to testify in support of the motion for a new trial. At the hearing on the motion on November 30, 1981, Fred was present in court and was sworn as a witness. He had engaged counsel who was recuperating at home from surgery and was unable to be present that day. In these circumstances, the trial judge refused to hear any testimony from Fred. This problem was temporary and could have been resolved by a continuance. After the court instructed him not to testify until he had consulted further with his attorney, Fred blurted out: "Well can I tell you all that I was the only one that operated my motor vehicle on that day?" The court stated that it would disregard that remark and told Fred to "stand aside." The following colloquy ensued:

> THE COURT: . . . Mr. Williamson, any other witnesses you wish to call?
> MR. WILLIAMSON: Not at this time Your Honor. Without the benefit of this witness' testimony I don't believe it would be in the best interest of my client to conclude my evidence under this motion at this time.

---

* The majority opinion focuses on the fact that Mrs. Collier knew of "the alleged fact of Fred's involvement" before trial, and that she told Randy what she had heard. Even if this hearsay would have been available to Randy through an exception to the hearsay rule, it is no substitute for a direct confession by the actual perpetrator of the crime.

THE COURT: Why not? What do you propose to do? When is the court going to have finality? Isn't that a risk that you run anytime?

The court asked the Commonwealth Attorney his position with respect to the motion. The response was:

Your honor, the problem as I indicated from the outset is that I see the office of the Commonwealth Attorney, the responsibility there is to make sure that justice prevails. The question is whether or not it did prevail with the verdict returned as it was.

- - - - - -

THE COURT: What do you propose I do now, do you move for the court to set aside this verdict or do you oppose it? [The Commonwealth Attorney] I can't oppose it at this point in time, your honor.

After further colloquy, the court informed counsel:

I don't give second trials. I want you to be sure.

The Commonwealth Attorney then stated that he would oppose the motion. The trial judge found that Randy had participated in a "cover-up" when he testified at trial. He stated:

. . . And when you let the person suffer for his own misconduct that is a proper remedy and that is exactly what Randy Odum is doing. He chose to make this bed and now the court says that he must sleep in it. He had his day in court and the fact that he took it on the chin for his brother is his problem. We don't know whether the brother will be convicted or not or whether the brother is lying today. Whether the brother was lying last week. There is nothing that says that Fred Odum is telling the truth. I wouldn't believe him on a stack of Bibles and I don't think any jury would.

The court thereupon denied the motion for new trial and stated: "I'm not open to hearing a further motion from either side on this type of disposition of this case."

When Randy appeared for sentencing on February 19, 1982, his then retained counsel presented a new motion and offered to

present "substantial evidence" in support thereof. The court stated that this was a request for a rehearing of the previous motion for a new trial. Defense counsel replied that the court had not previously heard "all the evidence." Asked what new evidence was tendered, counsel presented a seven-page confession of Fred Odum, taken and transcribed by the Goochland County Sheriff's Department, after Fred had been given the requisite warnings. The court expressed the belief that the confession had been presented on November 30. Counsel responded that the court had seen only Fred's brief affidavit on November 30, not the seven-page confession. The court then examined the confession and said: "Maybe that's not before the court then." Counsel pointed out other differences between the first and second motions for new trial. The court, however, refused to hear any evidence. It overruled the motion and proceeded to impose the sentences fixed by the jury.

The trial court surmised that both Odum brothers, and probably their mother, participated in a "cover-up" to exculpate Fred from the consequences of his guilt. They appeared at trial looking almost identical to confuse identification, gave evasive, probably perjured testimony, and kept Mrs. Collier in reserve, withholding her evidence from the jury.

Even if this suspicion is well-founded, it does not justify the trial court's conclusion. If Randy perpetrated a fraud on the court, conspired to obstruct justice, or committed perjury, he should be tried and punished for those wrongs, but he should not be penalized for a crime he did not commit. I cannot agree with the trial court that in "taking it on the chin for his brother," Randy is subjected to "a proper remedy." The court's remarks make it plain that it had some doubt whether Randy had committed the crime; but in view of his wrongful participation in a scheme to shield his brother, it considered that to be "his problem." I think it is our problem.

The multiple protections which surround an accused in our criminal justice system are often mystifying to observers trained in other disciplines. We justify them by our overriding concern that no innocent person will be convicted in error. In order to have peace of mind on this point, we can tolerate the escape from punishment of many whose guilt is probable, but not proved beyond a reasonable doubt. Abhorrence of conviction of the innocent is not only the bedrock upon which our criminal justice system rests, it is also fundamental to the public perception of its fairness. Justice

must not only be done; it must be seen to be done. A system which is perceived to be tolerant of the danger that an innocent person has been convicted, in order to punish him for some other act of which he is suspect, will forfeit public confidence.

The evidence of Fred Odum was so fundamental to the integrity of the conviction that it should have been heard, tested by cross-examination, and searched for corroboration before the motion for new trial was ruled on. In my view, the trial court abused its discretion by concluding in advance that it was unworthy of belief and disposing of the motion for a new trial without hearing it.

For these reasons, I would reverse the convictions and remand the cases for a hearing of all of the evidence tendered on the motions for a new trial, other than that relating to polygraph tests.

POFF, J., joins in dissent.