# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Malveaux, Athey and Senior Judge Petty


ANDREW JONATHAN BYRD, A/K/A
 ANDREW JONATHON BYRD

                                                    MEMORANDUM OPINION*
v.        Record No. 1878-23-3                            PER CURIAM
                                                      FEBRUARY 11, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RADFORD
Josiah T. Showalter, Jr., Judge

(Kelsey Bulger, Deputy Appellate Counsel; Virginia Indigent
Defense Commission, on briefs), for appellant.

(Jason S. Miyares, Attorney General; William K. Hamilton, Senior
Assistant Attorney General, on brief), for appellee.


A jury convicted Andrew Jonathan Byrd ("appellant") for child abuse or neglect resulting in

injury, in violation of Code § 18.2-371.1(A); aggravated malicious wounding, in violation of Code

§ 18.2-51.2(A); aggravated murder, in violation of Code § 18.2-31(12); abduction, in violation of

Code § 18.2-47; assault and battery, in violation of Code § 18.2-57; possession of

methamphetamine, in violation of Code § 18.2-250(A)(a); and interfering with an emergency rescue

call, in violation of Code § 18.2-164(B).[1]  Appellant argues the trial court erred in refusing a jury

instruction on proximate cause, denying his motion for a new trial, and admitting evidence that a

Physical Evidence Recovery Kit ("PERK") was used to evaluate the child victim.  After examining

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Appellant also was charged with use of a firearm in the commission of a felony, in
violation of Code § 18.2-53.1; brandishing a firearm, in violation of Code § 18.2-282; and
strangulation, in violation of Code § 18.2-51.6.  The jury found appellant not guilty of all three
offenses but did convict him of simple assault and battery as a lesser-included offense of
strangulation.

the briefs and record in this case, the panel unanimously holds that oral argument is unnecessary because "the appeal is wholly without merit," "the dispositive issue or issues have been authoritatively decided," and "the appellant has not argued that the case law should be overturned, extended, modified, or reversed." Code § 17.1-403(ii)(a)-(b); Rule 5A:27(a)-(b). Accordingly, finding no error in the trial court's judgment, we affirm appellant's convictions.

## I. BACKGROUND

"On appeal, 'we review the evidence in the "light most favorable" to the Commonwealth,' the prevailing party below." *Diaz v. Commonwealth*, 80 Va. App. 286, 295 (2024) (quoting *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc)). This principle "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" *Id.* (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc)).

H.M.[2] was born to Amanda Mitchell and her husband on January 8, 2018. In 2020, Mitchell and her husband were separated but shared custody of H.M. and their son, T.M. The two children alternated living with either parent for week-long periods.

Mitchell met appellant through social media. They "hit it off," and soon Mitchell, H.M., T.M., and Mitchell's other son, A.M., began to stay with appellant at his mother's home in Radford.

Appellant worked at Rural King in Radford, and Mitchell worked at Carilion New River Valley Medical Center in Radford, usually from 3:00 p.m. to 11:00 p.m. During weeks when H.M. and T.M. lived with Mitchell, she and appellant alternated watching the children during the day to accommodate their conflicting work schedules.

In February 2020, H.M. was with her mother when she fell from a shopping cart and hit her head, causing a bump to rise. Mitchell gave H.M. Motrin, and the bump eventually went away.

---

[2] We use initials, rather than the names of minor children, to protect their privacy.

On another occasion in late March or early April 2020, after appellant had been watching the children, he reported that H.M. had fallen on steps and hit a railing, causing a black eye. Mitchell took H.M. to an urgent care facility, where a doctor advised her that H.M. had a concussion. After a few days, the child behaved normally again.

Appellant's mother, Rebecca Woolwine, babysat for H.M. and Mitchell's other children on April 14, 2020, while Mitchell and appellant were at work. Woolwine did not notice bruises on H.M., and the child behaved normally at that time.

The same day, appellant reported to Mitchell that H.M. fell off a stationary "four-wheeler" while Mitchell was absent. Afterward, Mitchell noted that H.M.'s face was a bit red, but there were no bruises, cuts, or large bumps on her head. H.M. behaved normally in the days that followed.

The Offenses

On the morning of April 16, 2020, H.M. behaved normally and played with her brothers. There were no bruises on her face. Mitchell stayed home with the children that morning after appellant left for work at 6:00 a.m.[3]

Later that day, appellant was late to pick up Mitchell to take her to work as scheduled at 3:00 p.m.; consequently, Mitchell was late for her shift. By arrangement, appellant was to watch the children while Mitchell was at work.

While she was working, Mitchell texted appellant to remind him to feed the children. Appellant did not respond to Mitchell's text messages later that afternoon. At 5:20 p.m., Mitchell texted appellant, "It's not okay for you to just not answer me when you have my kids." Over the next four hours, Mitchell texted appellant and asked him to call. Appellant did not respond by text. While Mitchell worked, she and appellant twice spoke by phone; appellant said he was

---

[3] According to the store manager at Rural King, on April 16, 2020, appellant worked from about 11:00 a.m. until 3:00 p.m., when he left to take Mitchell to her job.

taking the children to get something to eat. Appellant also said H.M. was making "a gurgling or a growling sound," but Mitchell could not hear it over the phone.

Appellant had been scheduled to return to work after taking Mitchell to her job, and when he did not show up at Rural King, the store manager began texting and calling him. Appellant spoke with the manager around 6:30 p.m. and said he was going to the hospital to pick up Mitchell from work. The manager heard H.M. whining in the background and heard appellant respond to the child, "[I]t'll be okay, we're going to go get mommy."

Appellant arrived late to pick up Mitchell from work at 11:30 p.m. When Mitchell got in the car and started driving, she noticed that H.M., who was in a car seat, was not "acting right." H.M.'s breathing "didn't sound right," blood was coming from the corner of her mouth, and she did not respond to Mitchell. Mitchell was concerned and wanted to seek medical care for H.M., but appellant put a gun to her head and told her to drive. Mitchell complied.

As they drove, appellant said that H.M. had bitten her tongue. When they reached home, appellant carried H.M. into the house, took her to the bedroom where he usually slept, and put her on a mattress on the floor. H.M. had never slept in appellant's bedroom before, and Mitchell found it odd that H.M. was going to sleep there.

When Mitchell entered the room to check on H.M., she noticed bruises on the child's face; there was dried blood near her mouth and her body was "ice cold." Appellant began yelling at Mitchell as she used her own body to warm H.M. H.M.'s eyes were closed, and she was neither talking nor moving. Mitchell noticed that H.M. was wearing a different shirt and pants from what she had on when Mitchell had gone to work that day.

Mitchell and appellant argued in the living room, where appellant spilled some soda, threw more soda on Mitchell, and then ordered her to clean it up. Mitchell got a mop, but appellant grabbed it and struck her across the back with it, knocking her phone from her hand and into the

kitchen. As the two continued struggling, appellant "pinned" Mitchell against the kitchen floor and began strangling her. Appellant "kept saying that people were going to think that he did something," but Mitchell did not know what he meant by this.

In the midst of their fight, appellant said that H.M. "had spilled his bag of meth[amphetamine] in the car." At one point, appellant suggested that when H.M. had fallen from the four-wheeler she might have suffered "a small brain bleed and it's just something we didn't catch." Appellant gave Mitchell her phone and, at around 1:11 a.m., she and appellant searched the internet for information about concussions in children.

Eventually, appellant took Mitchell to the garage, where he smoked some methamphetamine. Mitchell asked if they could call an ambulance for H.M. In response, appellant slapped her in the face, screamed in her ear, bit her face, stomped her foot, and then slapped her in the face again. He said that if the police appeared he would "kill all of them" and "just shoot them all"; he also threatened to shoot both of Mitchell's parents in the head if she tried to leave.

After reentering the house, appellant shoved a shotgun in Mitchell's mouth, which "busted both of [her] lips." Mitchell eventually talked appellant into letting her check on H.M.

Mitchell then was able to retrieve her phone from the kitchen when appellant left her alone for a moment. She immediately ran to the bathroom and called Woolwine. Mitchell reported that something was wrong with H.M., appellant would not let her call for help, and appellant had been hitting her all night. She asked Woolwine to come to the house and to call 911.

When paramedics arrived at the home, H.M. was on the couch and did not appear to be breathing. She was pale, limp, very cold to the touch, and was bleeding from her mouth. Mitchell reported that H.M. had experienced a fall from a four-wheeler and that a doctor had told her to take the child to the hospital if her condition worsened. The paramedics took H.M. to the hospital, and Mitchell rode in the ambulance with them.

At the hospital, Mitchell told doctors that H.M. had fallen from a stationary four-wheeler a few days before and that she had gotten into some cabinets where they kept cleaning products. Doctors placed H.M. on a ventilator because she was not breathing sufficiently; her body temperature was only 81.1 degrees. They noted bruising all over H.M.'s body and that she was bleeding from her mouth and nose; they also noted blood in H.M.'s eardrum, indicating that she may have been hit in the head. The child's pupils were fixed and unresponsive to light. A CAT scan showed multiple areas of bleeding in H.M.'s brain. One of the treating physicians opined at trial that H.M.'s injuries were "due to abuse."[4] H.M. had exhibited none of her injuries when Mitchell left for work around 3:00 p.m. on April 16, 2020. On April 19, 2020, H.M. was pronounced brain dead due to her severe brain injuries and removed from life-support.

Post-Hospitalization Events

At 3:30 a.m. on April 17, 2020, appellant texted Woolwine that he "need[ed] a good lawyer." Eight minutes later, he texted her that "[w]hoever comes her[e] . . . in unifirm [sic] will die." He also said that he would not "go[] outside without a gun because i wnt [sic] go b[]a[]ck to jail." At 4:10 a.m., appellant wrote that he would "blow cops away" and that he would "not go back to jail over a lieing [sic] ass bitch." Appellant also called Woolwine "a snitch."

Police arrested appellant on April 17, 2020. Appellant tested positive for methamphetamine, THC, ecstasy, and other substances on that date. He told a fellow inmate in jail that while he was high on methamphetamine, a little girl fell while he was not watching her.

When interviewed by the police, appellant mentioned that H.M. had been "acting kind of funny" in the last few days, which followed her fall from a shopping cart. He also mentioned that H.M. had been injured in a fall from a four-wheeler. Appellant claimed that H.M.'s condition

---

[4] The physician qualified at trial, without objection, as an expert in "emergency or pediatric medicine."

deteriorated throughout April 16, 2020, while he was watching her. He explained that H.M.'s clothes had been changed because "she may have bit her lip." Appellant also said that something black had been coming from H.M.'s mouth and that he had wiped it away. Appellant denied using methamphetamine on April 16, 2020.

Appellant refused to leave his jail cell for a court proceeding on May 5, 2020. As jail officers tried to remove him from his cell, appellant shouted, "I done it! I done it! I killed her!" An officer's body camera footage of this incident, including appellant's statement, was entered into evidence and played for the jury at trial.

<u>Events at Trial</u>

At trial, the medical examiner who conducted H.M.'s autopsy described widespread injuries to H.M.'s body.[5] H.M. had 12 injuries to her face that were unrelated to medical therapy, and some "pattern injuries" to her back and face appeared to correspond to repeated strikes with a hand and knuckles. The medical examiner noted that there had been no healing to the bleeding around H.M.'s brain, indicating that H.M.'s injuries occurred around the time of her hospital admission. Additionally, the head injuries likely had been inflicted in the four days preceding H.M.'s death on April 19, 2020. The medical examiner opined that the cause of H.M.'s death was non-accidental blunt injuries to her head. She further opined that the injuries could not have occurred from falling from a shopping cart or a stationary four-wheel vehicle.

Appellant objected to a forensic nurse examiner testifying that she had performed a "PERK" exam on H.M. The trial court overruled the objection. The forensic nurse examiner then told the jury she had administered a PERK exam but found no signs of sexual assault.

Mitchell testified that she had learned that day that she was accused of killing H.M. She admitted that she had criminal charges pending against her, but stated that she had not been

---

[5] The medical examiner qualified at trial as an expert witness, without objection.

promised anything in return for her trial testimony against appellant. When asked if she was hoping to receive "some consideration," she responded, "I'm hoping for a good outcome."

The Verdicts

For his conduct toward H.M., the jury convicted appellant for child abuse or neglect resulting in injury, aggravated malicious wounding, and aggravated murder. For his conduct toward Mitchell, the jury convicted him for abduction and assault and battery. As noted above, appellant also was convicted for possession of methamphetamine and interfering with an emergency call.

This appeal followed.

## II. ANALYSIS

### A. Jury Instruction on Proximate Cause

The trial court refused appellant's proximate cause jury instruction that stated, "[a] proximate cause of an accident, injury, or damage is a cause that, in natural and continuous sequence, produces the accident, injury or damage. It is a cause without which the accident, injury, or damage would not have occurred." Appellant contends that the trial court erred in denying the instruction because the jury was required to determine whether he caused the injuries to H.M. He maintains that the Commonwealth's "reliance on circumstantial, rather than direct, evidence left open the possibility that [appellant] did not cause serious injury or death to H.M."

"As a general rule, the matter of granting and denying instructions . . . rest[s] in the sound discretion of the trial court." *Griffin v. Commonwealth*, 78 Va. App. 116, 143 (2023) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "The trial court's 'broad discretion in giving or denying instructions requested' is reviewed for an abuse of discretion." *Dandridge v. Commonwealth*, 72 Va. App. 669, 679 (2021) (quoting *King v. Commonwealth*, 64 Va. App. 580, 586 (2015) (en banc)). "Our sole responsibility in reviewing [jury instructions] is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly

- 8 -

raises." *Pena Pinedo v. Commonwealth*, 300 Va. 116, 121 (2021) (alteration in original) (quoting *Cooper*, 277 Va. at 381). "[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Cheripka v. Commonwealth*, 78 Va. App. 480, 503 (2023) (alteration in original) (quoting *Watson v. Commonwealth*, 298 Va. 197, 207 (2019)).

We assume, without deciding, that the proffered instruction was a correct statement of law supported by a scintilla of evidence.[6] But even if a trial court errs in denying a proper instruction, we will not reverse the judgment if that error was harmless. "The United States Supreme Court has repeatedly stated that harmless error analysis is appropriate in the context of improper jury instructions." *Conley v. Commonwealth*, 74 Va. App. 658, 684 (2022) (quoting *Kil v. Commonwealth*, 12 Va. App. 802, 812 (1991)). "Thus, '[w]here a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.'" *Id.* (alteration in original) (quoting *Kil*, 12 Va. App. at 812).

Here, for the crimes involving H.M., the trial court instructed the jury that the Commonwealth was required to prove that appellant caused H.M.'s injuries or death. Overwhelming evidence supports the jury's finding that he did. H.M. was uninjured when appellant left Mitchell at work at 3:00 p.m. on April 16, 2020. H.M. remained in appellant's care until he picked up Mitchell after 11:00 p.m. Mitchell immediately noticed that H.M. was unresponsive, there was blood coming from the corner of her mouth, and her breathing "didn't

---

[6] "[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. White*, 293 Va. 411, 419 (2017) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015)). "The mechanism of assuming without deciding a particular point in issue sometimes facilitates the appellate court's achievement of this goal." *Ali v. Commonwealth*, 75 Va. App. 16, 37 n.9 (2022); *see also Drexel v. Commonwealth*, 80 Va. App. 720, 751 (2024) (applying said mechanism).

sound right." At home, Mitchell saw bruising to the child's face and head and felt that her body was "ice cold." Appellant assaulted Mitchell and initially prevented her from calling 911. When Mitchell questioned what had happened to H.M., appellant said that the child had spilled his methamphetamine in the car, and he thought he would be blamed for her condition. Appellant also acknowledged that the child might have a head injury.

The medical evidence presented to the jury established that H.M.'s injuries, including the fatal blows to her head, were from blunt force trauma and could not have been accidental. H.M. was injured near the time of her hospital admission, not days before.

Finally, appellant directed numerous inculpatory text messages to his mother in the hours after paramedics transported H.M. to the hospital. And when he refused to attend court proceedings, appellant declared to jail officials that he had "done it" and "killed [H.M.]"; the jury watched and heard a jail official's body camera footage in which appellant made these statements, which negated altogether any reasonable doubt on the issue of causation. Upon this record, we conclude that the evidence at trial established appellant's guilt beyond a reasonable doubt, and so we hold that any possible error in denying appellant's proposed jury instruction on proximate cause was harmless.

B. Motion to Set Aside

In June 2023, three months after appellant's jury trial but before sentencing, a grand jury indicted Mitchell for crimes relating to H.M.: felony murder, involuntary manslaughter, child endangerment, and child abuse or neglect. Appellant moved the trial court to set aside his verdicts, claiming that the recent charges against Mitchell were newly-discovered evidence justifying a new trial. Citing the recent indictments against Mitchell, appellant further claimed in his post-trial motion that the Commonwealth had failed to disclose material exculpatory evidence under *Brady v.*

*Maryland*, 373 U.S. 83 (1963). The trial court found no merit to appellant's arguments and denied the motion.

### 1. Newly Discovered Evidence

"A motion for a new trial based on after-discovered evidence is a 'matter submitted to the sound discretion of the [trial] court and will be granted only under unusual circumstances after particular care and caution has been given to the evidence presented.'" *Bondi v. Commonwealth*, 70 Va. App. 79, 92 (2019) (quoting *Orndorff v. Commonwealth*, 279 Va. 597, 601 (2010)). To show that he is entitled to a new trial, the moving party must prove that the evidence

> (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.

*Id.* (quoting *Odum v. Commonwealth*, 225 Va. 123, 130 (1983)).

At trial, Mitchell admitted that she faced criminal charges as a result of the events resulting in H.M.'s death and that she hoped for a favorable outcome in light of her testimony against appellant. In fact, she acknowledged that she was accused of killing H.M. Mitchell's June 2023 indictments were thus simply cumulative and corroborative of Mitchell's impeachment at appellant's trial and were not "such as should produce opposite results" at a new trial. *Id.* (quoting *Odum*, 225 Va. at 130). Accordingly, we find no abuse of discretion in the trial court's denial of appellant's motion for a new trial based on newly-discovered evidence.

### 2. *Brady* Claim

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Warnick v. Commonwealth*, 72 Va. App. 251, 268 (2020) (quoting *Brady*, 373 U.S. at 87). To establish a *Brady* violation, a

defendant must prove that: the evidence was favorable to him; the Commonwealth failed to disclose it, either inadvertently or purposefully; and that the evidence was material—that is, "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* (quoting *Church v. Commonwealth*, 71 Va. App. 107, 117 (2019)). "Without undisclosed favorable evidence, a *Brady* violation cannot occur." *Mercer v. Commonwealth*, 66 Va. App. 139, 150 (2016).

Appellant identifies no evidence or information that the Commonwealth failed to disclose to him before trial. Clearly, the Commonwealth could not have disclosed Mitchell's June 2023 indictments before appellant's trial because the grand jury had not yet returned those indictments at the time of trial. The record contains no indication that the prosecutor here intended to seek further criminal charges against Mitchell at the time of appellant's trial. But even if the prosecutor did plan to seek the June 2023 indictments, appellant cites no legal authority, and we are aware of none, to support a conclusion that *Brady* requires the Commonwealth to reveal its mere intention to pursue criminal charges against a trial witness. We thus find no error in the trial court's denial of appellant's post-trial *Brady* claim.

C. Evidence of H.M.'s PERK Exam

Appellant contends that the trial court erred in admitting evidence that a PERK exam was performed on H.M. He notes that he was not charged with sexual assault and that the PERK exam provided no evidence of sexual assault. Appellant thus argues that evidence pertaining to the PERK exam had no probative value. Consequently, appellant maintains that "the *only* purpose of the evidence was to generate a strong emotional response in the jury and inflame their passions," and therefore "the probative value of the evidence (none) was substantially outweighed by the danger of unfair prejudice."

"On appeal, a court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *Drexel v. Commonwealth*, 80 Va. App. 720, 739 (2024). "A reviewing court can conclude that an abuse of discretion occurred only when reasonable jurists could not differ about the correct result." *Id.* (quoting *Howard v. Commonwealth*, 74 Va. App. 739, 753 (2022)).

Here, we assume arguendo that the trial court erred in admitting evidence respecting H.M.'s PERK examination. But even if that evidence was erroneously admitted, any such error was harmless.

"Unless otherwise provided by statute, Code § 8.01-678 requires a harmless error review in all cases." *Cheripka*, 78 Va. App. at 504. We evaluate purported errors in the admission or exclusion of evidence under the standard for non-constitutional harmless error. *Davis v. Commonwealth*, 79 Va. App. 123, 146 (2023). Under that standard, "[t]his Court may uphold a decision on the ground that any error involved is harmless only if it can conclude, without usurping the jury's fact-finding function, 'that the error did not influence the jury[] or had but slight effect.'" *Id.* at 146 (second alteration in original) (quoting *Graves v. Commonwealth*, 65 Va. App. 702, 712 (2016)).

As noted in Section II.A., supra, the evidence of appellant's guilt of the charged offenses against H.M. was overwhelming—not least appellant's own statements to jail officials that he had "done it" and "killed [H.M.]." And particularly because the jury considered elements of those offenses, and evidentiary proof thereof, that did not relate to sexual assault or other sexual misconduct, the lack of any evidence of sexual assault by appellant could only have had but slight effect on the jury's deliberations. Accordingly, we reject appellant's argument and uphold appellant's convictions for offenses against H.M.

D.  Assault and Battery of a Family or Household Member

In addition to the foregoing offenses, appellant was convicted in the juvenile and domestic relations district court for assault and battery of a family or household member, Mitchell, in violation of Code § 18.2-57.2.  Appellant appealed his conviction, was arraigned on that charge by the trial court, and the jury was instructed on assault and battery of a family or household member.  But the record does not contain a verdict form for that offense, and the trial transcript does not contain a pertinent verdict returned by the jury in open court.[7]  Likewise, the trial court's conviction order does not reflect a conviction for assault and battery of a family or household member.  Yet the sentencing order in this matter indicates that the jury convicted appellant of "A&B of Family Member . . . [Code §] 18.2-57.2" and that the trial court imposed a 12-month sentence for such conviction.  Because the record does not support that appellant was convicted of assault and battery of a family or household member, we remand this matter to the trial court for the sole purpose of amending its sentencing order to correct the clerical errors discussed here.  *See* Code § 8.01-428(B); *Zhou v. Zhou*, 38 Va. App. 126, 133 (2002) (noting that Code § 8.01-428(B) "provides the trial court with the authority . . . to correct 'clerical mistakes' in its decree or errors in the record so as to cause the acts and proceedings to be set forth correctly").

### III.  CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed and remanded.*

---

[7] The record does contain a verdict form for the charge of strangulation, which form, together with the pertinent jury instruction, provided for conviction for the lesser-included offense of simple assault and battery.  The verdict form indicates a conviction for that lesser-included offense, and the transcript reflects the delivery of that verdict in open court.  The trial court's conviction and sentencing orders also reflect this conviction.