COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Friedman, Callins and White
Argued at Salem, Virginia


ANGELA KEY BENNETT, SOMETIMES KNOWN AS
 ANGELA MARIE BENNETT, F/K/A
 ANGELA MARIE KEY

                                                    MEMORANDUM OPINION[*] BY
v.       Record No. 0640-22-3              JUDGE KIMBERLEY SLAYTON WHITE
                                                            MAY 2, 2023

CARROLL COUNTY DEPARTMENT
 OF SOCIAL SERVICES


                FROM THE CIRCUIT COURT OF CARROLL COUNTY
                      William D. Broadhurst, Judge Designate

           John S. Koehler (The Law Office of James Steele, PLLC, on brief),
           for appellant.

           Michael R. Bedsaul (Joey D. Haynes, Guardian ad litem for the
           minor children; Sands Anderson, PC; The Jackson Law Group,
           PLLC, on brief), for appellee.


       Angela Key Bennett ("Bennett") appeals the orders from the Circuit Court of Carroll

County terminating her parental rights to her three children, approving the foster care goal of

adoption, and denying her motion to suspend the judgment.  Bennett argues that the circuit court

erred in denying her motion to suspend the judgment so she could file a "motion to reconsider and

set aside" the court's judgment and present an investigative report from the Office of the Children's

Ombudsman when it was completed.  Bennett also contends that the circuit court erred by

terminating her parental rights under Code § 16.1-283(C)(2) and finding that the Carroll County

---

[*] This opinion is not designated for publication.  *See* Code § 17.1 413.

Department of Social Services ("the Department") had provided reasonable and appropriate services to her and the children. Finding no error, we affirm the circuit court's judgment.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). Here, the Department was the prevailing party, so we view all the evidence and draw all fair inferences in the Department's favor.

A. Conditions Leading to Children's Removal

Bennett is the biological mother of the three children who are the subject of this appeal, J.H., A.H., and T.K.[2] The family had a protracted history with child protective services. On March 24, 2014, the Grayson County Department of Social Services placed J.H. and A.H., then ages seven and three, into foster care due to Bennett's incarceration, substance abuse, and child neglect.[3] Bennett received numerous services, including individual counseling, substance abuse counseling, parent educator services, and family counseling. Bennett complied with the requirements of the foster care plans and regained custody of J.H. and A.H. in May 2015. As part of its order, the

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues Bennett has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[2] The children's biological fathers voluntarily entered into entrustment agreements, and the circuit court terminated their parental rights.

[3] T.K. was not born until 2016.

Grayson County Juvenile and Domestic Relations District Court prohibited Ricky Key from having any contact with the children.

Bennett subsequently married Key, who previously had been incarcerated and was then allegedly sober for two and a half years. In March 2017, Bennett asked the Grayson County Juvenile and Domestic Relations District Court to amend its no contact order. In October 2018, the court modified its order to allow supervised contact between the children and Key.[4]

Seven months later, on May 21, 2019, the police notified the Department that Bennett and Key had been arrested for drug charges and that J.H., A.H., and T.K., then ages 13, 8, and 3, had been left home alone. Bennett tested positive for amphetamines, methamphetamine, cocaine, and MDMA (aka Ecstasy). Bennett denied having used any illegal drugs for six or seven years, but later admitted she had used methamphetamine "over the weekend." The children entered foster care because there were no other viable placement options.

The Carroll County Juvenile and Domestic Relations District Court (JDR court) entered emergency and preliminary removal orders. Bennett submitted to a "follow up drug screen" and tested positive for amphetamines, oxycodone, and methamphetamine.[5] The JDR court adjudicated the children to be abused or neglected and subsequently entered dispositional orders.

As a result of the May 2019 incident, Bennett was charged with possession of a Schedule I/II drug and three counts of felony child abuse or neglect, which were amended to three misdemeanor charges of contributing to the delinquency of a minor. Bennett was diverted to the drug court program, under which she had to submit to random drug screens; all drug screens were negative for illegal substances. Bennett also had to participate in individual counseling and

---

[4] In January 2020, the Carroll County Juvenile and Domestic Relations District Court amended the order to prohibit contact between the children and Key.

[5] Bennett claimed she had a prescription for Percocet but failed to provide it to the Department.

"smart group recoveries." She "met all expectations" and graduated from the program. On May 5, 2021, the circuit court dismissed Bennett's criminal charges.

In addition to the services offered through the drug court program, Bennett received referrals through the Department to other services, including a psychological and substance abuse assessment, as well as an attachment and parental capacity assessment. The Department also referred Bennett to substance abuse treatment and individual counseling. Further, the Department arranged for supervised visitation with the children, and Bennett participated in parent education through the Youth Advocate Program (YAP).

In September 2019, Bennett completed the psychological and substance abuse assessment with Dr. Daniel Porter. Dr. Porter diagnosed Bennett with personality disorder "mixed with borderline, narcissistic and paranoid traits" and opined that she would not be "an appropriate caretaker" for the children. Dr. Porter recommended that Bennett complete inpatient substance abuse treatment, followed by intensive outpatient treatment because Bennett had not demonstrated "a persistent or consistent period of abstinence from addictive substances."[6] Dr. Porter opined that Bennett's "prognosis for constructive change [was] tenuous at best" and that counseling was "not likely to be effective" because of her "significant personality disorder."

Bennett disagreed with Dr. Porter's evaluation and opinions, so she sought a second opinion from Dr. Ralph Ramsden.[7] The Department expressed concern, however, that the information in

---

[6] Bennett refused to participate in an inpatient substance abuse treatment program and instead wanted to continue with the intensive outpatient treatment she was receiving through the drug court program. At the circuit court hearing, Bennett denied objecting to the inpatient treatment program.

[7] Dr. Ramsden had evaluated Bennett in 2014 when her children were in foster care in Grayson County.

Dr. Ramsden's evaluation was "based solely on [Bennett's] self-reporting."[8] Dr. Ramsden diagnosed Bennett with adjustment disorder with anxiety and "features" of obsessive-compulsive personality disorder; he opined that Bennett was at "risk for relapse" with her substance use. Nonetheless, Bennett was "presenting with apparent motivation for positive change." Dr. Ramsden recommended intensive psychotherapy services, in-home parenting services, and random drug screens. Dr. Ramsden also recommended an attachment assessment to determine the children's attachment with Bennett because "[i]f there are generally healthy parent-child connections permanent removal from [Bennett] can be psychologically damaging to the children."

Bennett participated in an attachment assessment, consistent with Dr. Ramsden's recommendation. The evaluator opined that Bennett lacked "the secure attachment patterns, parenting skills, and psychological resources which would be necessary to help [the children] recover and thrive if they [were] placed in [her] care." The evaluator recommended that Bennett participate in "intensive outpatient trauma therapy as well as subsequent individual and group psychotherapy." The evaluator estimated that it could take "years" for Bennett to address her trauma and attachment issues before she would be able to parent the children effectively. The evaluator recommended that Bennett continue to undergo random drug screens, even though she had completed her substance abuse therapy. The evaluator further opined that there was "very likely a trauma bond" between the children and Bennett that negatively impacted the children, as evident by their behaviors before and after visitations.

The Department initially had offered Bennett bi-weekly supervised visitation, which progressed to weekly community visits. The onset of the COVID-19 pandemic forced the

---

[8] The Department clarified that Dr. Ramsden had relied on documents, such as Dr. Porter's evaluation and Bennett's treatment records, that Bennett provided; the Department did not provide any documents, such as its foster care plans or records from the children's counselors, to Dr. Ramsden to give him "a full summary of . . . the family dynamics."

Department to cancel the in-person visits; however, the Department offered virtual visits twice per week with J.H. and A.H. and telephonic visits with T.K. Although the Department had to remind Bennett repeatedly of the visitation guidelines and the prohibition about discussing the court case with the children, Bennett denied saying anything inappropriate.

The children reacted negatively to visitation with Bennett. After his visits, T.K. "show[ed] regression in progress made by soiling himself, becom[ing] physical[ly] and verbally aggressive toward himself and others, and becom[ing] restless throughout the night." A.H. became "very stressed" and angry about the visits; after some visits, A.H. had "full blown meltdowns" or was "very argumentative with her siblings." J.H. was "very angry" at Bennett and developed nervous tics, such as excessive blinking.

After receiving reports of the children's deteriorating behavior and Bennett's rule violations, the Department suspended the virtual and telephonic visits. Without permission, Bennett then contacted J.H. and A.H. through social media and their video game system. The children's counselors recommended that the Department suspend visitation indefinitely, which it did in August 2020. Thereafter, the children's behaviors improved. Both J.H. and A.H. appeared "very happy and much less stressed." A.H. was not angry or aggressive, J.H.'s tics stopped, and T.K. was calmer.

The Department had filed foster care plans with the goal of return home and a concurrent goal of relative placement, which the JDR court initially approved. On July 27, 2020, the JDR court disapproved of the goals of return home and relative placement and ordered the Department to file new plans with the goal of adoption. After approving "temporary permanency planning orders," the JDR court terminated Bennett's parental rights and approved the foster care goal of adoption on May 5, 2021. Bennett appealed to the circuit court.

Pending the circuit court hearing, the Department allowed Bennett to resume visitation with T.K. The Department, however, again suspended the visits in November 2021, following the recommendation of T.K.'s counselor, because T.K.'s behavior had deteriorated to the point of him "screaming, crying, [and] throwing himself on the floor at home and at school" after visits. Once the visits stopped, the severity and frequency of T.K.'s tantrums decreased.

## B. Circuit Court Hearing

When the parties appeared before the circuit court in February 2022, T.K. was 5 years old, A.H. was 11 years old, and J.H. was 15 years old. They had been in foster care for 33 months. A.H. and J.H. had been together in the same foster home for the entire time. To provide T.K. with more resources to suit his needs, the Department removed T.K. from the foster home with his siblings and placed him in a different foster home for approximately one year. At the time of the circuit court hearing, T.K. had resumed residence in the same foster home as his siblings. The children's foster parents had expressed an interest in adopting them.

The foster mother reported that she initially had tried to have "open communication" with Bennett by informing her of the children's illnesses and sharing photographs with her. However, the foster mother stopped communicating with Bennett because Bennett was "more focused" on her feelings about the Department and the court proceedings than on the children and their needs.

The children reportedly were doing well in foster care. Since returning to the foster home where A.H. and J.H. lived, T.K. had bonded with the foster family and had a "positive relationship" with them. T.K. was in kindergarten and "doing well" academically, but still "struggle[d]" with tantrums. A.H. was "thriving" in the foster home and enjoyed a "very close" relationship with the foster mother. She was "doing really well" academically and had no "behavioral problems." J.H. also had a "positive" relationship with the foster family and was "doing really well" in school.

The Department presented evidence of the services that it offered the children. T.K. had been diagnosed with attention deficit hyperactivity disorder (ADHD) and reactive attachment disorder. T.K. participated in play, behavioral, and trauma therapy and received services through YAP. T.K.'s counselor explained that "[c]hanges can set him back and changes often do bring about changes in his behaviors." T.K.'s counselor noticed that T.K.'s behavior "decline[d]" and became "aggressive" after visiting with Bennett, and given T.K.'s "reactive behaviors," she had recommended suspending Bennett's visitation. T.K.'s counselor opined that returning to Bennett's care would be "detrimental to [T.K.'s] mental health and wellbeing" because he would experience "significant regression."

A.H. had been diagnosed with adjustment disorder and anxiety; she participated in individual counseling. A.H.'s counselor opined that trauma was the "source and trigger for the majority of her anxiety" and that A.H. "connect[ed] the trauma with her mother." A.H.'s counselor had noticed that A.H. was "making progress," but she was experiencing stress due to how long the court process was taking. A.H. was "very happy and very well adjusted" in her foster care placement but was worried that she "may be forced to leave" and live with her mother or father. A.H.'s counselor opined that returning to Bennett's care would be "very detrimental" and "crushing" for A.H.

J.H. had been diagnosed with post-traumatic stress disorder, anxiety, and ADHD; he participated in individual counseling. J.H.'s counselor reported that he had "done very well overall" in foster care. J.H. had processed the trauma and was working on coping with the stress of how long the court process was taking. He had expressed that he wanted no contact with Bennett, her parental rights terminated, and to remain in his current placement. J.H.'s counselor opined that returning to Bennett's custody would be "detrimental" to J.H.

The Department also remained concerned over Bennett's relationship with Key. Bennett was married to Key when the children entered foster care in May 2019. While the children were in foster care, Bennett reported that she had divorced Key and had no contact with him; however, the Department had observed them together in the community and at her house. Bennett explained that despite the divorce, she and Key remained friends. She "frequently" gave him rides and had driven him to court when the Department saw them together. Bennett assured the Department and the circuit court that she would not allow Key to be around the children. Bennett acknowledged that in December 2021, Key had been charged with a new felony of possession of a Schedule I/II drug. She admitted to bonding him out of jail but claimed that she had done so "[f]or his mother."

The Department acknowledged that Bennett had accepted its services and sought additional services, such as substance abuse treatment, on her own. Nevertheless, Bennett had not completed all the required services at the time of the circuit court hearing and had not "made real progress in her mental health . . . [or] her ability to parent." She also had not "been able to repair the relationship with her . . . children."

At the conclusion of the Department's evidence, Bennett moved to strike, which the circuit court denied. Bennett then presented evidence about her participation in counseling. Her counselor testified that Bennett believed that "she did not have any childhood trauma," so sessions to address trauma issues "didn't go anywhere." The counselor instead worked with Bennett on her role, and others' roles, in the family unit. The counselor opined that Bennett had "made quite a bit of progress," but was not "quite done."

Bennett testified that within a few weeks of the children being in foster care, she sought substance abuse treatment. Bennett completed the drug court program, including an intensive outpatient substance abuse treatment program, and tested negative on all her drug screens from July 2019 through January 2022. Bennett emphasized that she had "met all expectations" and was a "top

- 9 -

graduate" of the program. After successfully completing the drug court program, she was released from probation and her criminal charges were dismissed.

Bennett expressed frustration with the Department and her own efforts to seek additional visitation and services. She claimed that it took two months for the Department to assign someone to her case. Bennett completed parenting classes through YAP, and in April 2020, she had asked an employee at YAP to assess her home because the Department had not been there since July 2019.

Bennett noted that although she had participated in the attachment assessment, the Department did not refer Bennett to any of the recommended services; instead, it petitioned to terminate her parental rights shortly after receiving the results. Bennett then sought services on her own from Mount Rogers Community Services, Project Link, Family Preservation Services, and the Center for Hope for Attachment and Trauma. For three months, Bennett travelled to Bristol, Tennessee, to receive counseling for trauma and attachment issues, but could not continue further with the attachment therapy without the children.

Bennett expressed her love for her children and acknowledged that they should not "pay for the parents' mistakes." She wanted what was "best" for the children, and she admitted that if it was "detrimental" for J.H. and A.H. "to come home," then she did not want that. She acknowledged that J.H. and A.H. "might need to stay" with their foster family because "they have been through too much." Bennett, however, believed that T.K. needed her and wanted him to come home.

C. The Circuit Court's Findings

After considering the evidence and the parties' arguments, the circuit court found that the Department had made "reasonable and appropriate efforts" to assist Bennett with reunification. The circuit court acknowledged Bennett's efforts to obtain the required services, including therapy, but found that "she never successfully completed it." Thus, the circuit court found that Bennett had not made "substantial progress" toward reunification. It also found Bennett's continued "involvement"

with Key to be "a significant factor in evaluating" Bennett's credibility because she "should have recognized the danger of him in her life."

The circuit court further found that each of the children suffered from a "different trauma," and even if Bennett had met the Department's requirements, "the reality" was that they had "suffered too much trauma to return to her care." The circuit court "appreciate[d]" Bennett's acknowledgement that it was in J.H. and A.H.'s best interests to remain with the foster parents, but it noted that Bennett failed to recognize the "significant behaviors" that T.K. exhibited before and after his visitations with her. The circuit court held that it was in the children's best interests to terminate Bennett's parental rights and approve the foster care goal of adoption. On April 6, 2022, the circuit court entered orders terminating Bennett's parental rights under Code § 16.1-283(C)(2), as well as permanency planning orders approving the foster care goal of adoption.

On April 19, 2022, Bennett moved to suspend the judgment so she could file a "motion to reconsider and set aside" the circuit court's judgment. Bennett argued that suspending the judgment would permit her to introduce after-discovered evidence. Bennett explained that prior to December 15, 2021, she had filed a complaint against the Department with the Office of the Children's Ombudsman (OCO), which was investigating the matter. She asked the circuit court to review the OCO's report, which had not been completed, before it rendered a final judgment. The Department objected, arguing that Bennett knew about the OCO's investigation before the final hearing but did not request a continuance or bring it to the circuit court's attention until after it had ruled.

The circuit court denied Bennett's motion. The circuit court was "not persuaded that the content of the report [was] relevant admissible evidence." It further held that the OCO's responsibility was "an administrative one, not a judicial one," and its report "was not intended to be considered as evidence in 'a legal proceeding' like this one." Most significantly, however, the circuit court found that even if Bennett had tendered an OCO report criticizing the Department's

handling of her case, "it would not have changed the [c]ourt's findings." The circuit court had found that the Department's services were "responsive and reasonable." The circuit court considered evidence produced at trial of Bennett's "multiple complaints" against the social worker in determining the credibility of the witnesses. The circuit court concluded that a "report from OCO finding negative conduct by [the social worker] would not have changed that analysis." Thus, the circuit court held that "the apparently imminent release of the first draft of the OCO report would not affect the prior judgment of the [c]ourt and [did] not justify suspension of the [c]ourt's orders disposing of these cases." Bennett appeals.

ANALYSIS

A. Motion to Suspend the Judgment

"All final judgments, orders, and decrees, irrespective of terms of court, remain under the control of the trial court and may be modified, vacated, or suspended for [21] days after the date of entry, and no longer." Rule 1:1(a). "A motion for a new trial based on after-discovered evidence is a 'matter submitted to the sound discretion of the circuit court and will be granted only under unusual circumstances after particular care and caution has been given to the evidence presented.'" *Bondi v. Commonwealth*, 70 Va. App. 79, 92 (2019) (quoting *Orndorff v. Commonwealth*, 279 Va. 597, 601 (2010)). "We will not reverse the court's decision except for an abuse of discretion." *Id.*; *see also Shooltz v. Shooltz*, 27 Va. App. 264, 269 (1998) (same). To warrant a new trial, a party must show that the after-discovered evidence:

> (1) appears to have been discovered subsequent to the trial;
> (2) could not have been secured for use at the trial in the exercise
> of reasonable diligence by the movant; (3) is not merely
> cumulative, corroborative or collateral; and (4) is material, and
> such as should produce opposite results on the merits at another
> trial.

*Bondi*, 70 Va. App. at 92 (quoting *Odum v. Commonwealth*, 225 Va. 123, 130 (1983)); *see also Joynes v. Payne*, 36 Va. App. 401, 418 (2001) (same). "The moving party must establish each of

- 12 -

these mandatory criteria." *Bondi*, 70 Va. App. at 92 (quoting *Commonwealth v. Tweed*, 264 Va. 524, 529 (2002)).

Bennett argues that the circuit court erred by denying her motion to suspend the judgment. Bennett contends that the OCO's report was relevant to the circuit court's decision to determine whether the Department had provided reasonable and appropriate services. Bennett asserts that the report would constitute "after-discovered evidence" because it had not been completed when the circuit court hearing occurred. Bennett alleges that the children would not be prejudiced by any delay because they would remain with the same foster family and continue to receive services.

Bennett did not meet her burden of proving that the OCO's report was after-discovered evidence that warranted suspending the circuit court's judgment. Although the OCO's conclusions were not available when the circuit court entered the orders terminating Bennett's parental rights, it found that any report from the OCO concluding that the services were not "in administrative compliance" or the social worker was "biased" would not affect its conclusions. The circuit court considered Bennett's complaints regarding the social worker and the Department but concluded that the Department's services were "responsive and reasonable." Therefore, Bennett failed to prove that the OCO report was sufficiently material to produce "opposite results on the merits at another trial." *Id.* (quoting *Odum*, 225 Va. at 130). To the contrary, "[w]e know with certitude, from the factfinder himself, that the outcome of the proceeding would not have been different" if Bennett had produced the report at the hearing. *Deville v. Commonwealth*, 47 Va. App. 754, 757 (2006) (rejecting due process claim under *Brady v. Maryland*, 373 U.S. 83 (1963), because "[p]rejudice cannot be shown where, as here, 'the trial judge was the trier of fact and, upon learning of the undisclosed information,' rules unequivocally that the impeachment evidence 'would have had no impact' on the factfinding underlying the defendant's conviction" (quoting *Correll v. Commonwealth*, 232 Va. 454, 466

- 13 -

(1987))). Because the report was not material, we need not determine whether it was admissible.[9]

Additionally, Bennett must prove that she could not have acquired the OCO report prior to trial. *Bondi*, 70 Va. App. at 92. The record shows Bennett requested the investigation and was made aware that it had commenced December 15, 2021, approximately two months prior to trial. Bennett did not request a continuance or make the court aware of the existence of the investigation nor the necessity of the report until *after* the court ruled against her. Because Bennett failed to prove that the report was sufficiently material as to be outcome determinative, nor prove that it could not have been acquired for trial with reasonable diligence, the circuit court did not abuse its discretion by denying Bennett's motion.

## B. Reasonable and Appropriate Services

Bennett challenges the circuit court's orders terminating her parental rights. "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (alteration in original) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

The circuit court terminated Bennett's parental rights under Code § 16.1-283(C)(2), which authorizes a court to terminate parental rights if:

---

[9] *See Commonwealth v. White*, 293 Va. 411, 419 (2017) ("The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015))).

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (alteration in original) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). Bennett contends that the circuit court erred in finding that the Department provided her and the children with reasonable and appropriate services and that she had not made reasonable efforts to remedy the conditions that led to, or required continuation, of the children's foster care placement.

"'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 163 (2004) (quoting *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 338-39 (1992)). Here, the circuit court considered all the evidence and found that the Department had made "reasonable and appropriate efforts to help [Bennett] achieve reunification with her [c]hildren." The Department referred Bennett for a substance abuse assessment with Dr. Porter; an attachment and parenting assessment with Sharon Brammer, LPC; the Project Link program for substance abuse treatment; individual counseling to address mental health needs through the Mount Rogers CSB; services through Occupational Enterprises to provide employment assistance services; parenting services with YAP; and parent educator services through Mount Rogers. The Department also coordinated supervised visitation with the children and conducted random unannounced drug screens. The evaluators recommended that

Bennett participate in trauma therapy. The Department referred T.K. to play therapy, behavioral therapy, trauma therapy, YAP services, psychiatric services, and medication management. A.H. and J.H. were referred to individual counseling with Mount Rogers Youth and Family Services. The circuit court found that the Department "was not required to duplicate the other efforts of [Bennett's] drug court program," where Bennett had received substance abuse treatment.

### C. Substantial Remedy

The children had entered foster care because of Bennett's substance abuse and her relationship with Key, but they remained in foster care because Bennett failed to make substantial progress with her ability to parent. Bennett emphasizes that she sought many services on her own and had made "substantial progress in overcoming her substance abuse issues." Although Bennett may have started the therapy, the circuit court found that she did not complete it because she did not believe that she had any childhood trauma. Moreover, Bennett maintained a relationship with Key, despite the court's order prohibiting him from having any contact with the children. Key had been charged with drug offenses as recently as December 2021, three months before the circuit court hearing, and Bennett had posted his bail. The circuit court found Bennett's on-going relationship with Key was "a significant factor in evaluating the credibility of [m]other" and she "should have recognized the danger that her continued relationship with Mr. Ricky Key create[d] upon her ability to regain custody of her [c]hildren."

At the time of the circuit court hearing, the children had been in foster care for 33 months. The circuit court commended Bennett for acknowledging that it was in J.H. and A.H.'s best interests to remain with the foster care family. The circuit court, however, was concerned that Bennett was so focused on her "desire" to have T.K. returned to her that she failed to recognize "the significant behaviors" that T.K. exhibited before and after his visits with her. T.K.'s behavior had improved once the Department suspended the visitation. Despite all the

services provided to the family, Bennett still was not in a position to resume custody of the children. In fact, the attachment therapy evaluator estimated that it could take "years" for Bennett to address her trauma and attachment issues before she would be able to parent the children effectively. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 322 (2013) (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). Considering the totality of the circumstances, the circuit court did not err in terminating Bennett's parental rights and approving the foster care goal of adoption.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

*Affirmed.*