COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Malveaux, Raphael and Frucci
Argued at Arlington, Virginia


ZACKARY THOMAS BURKARD

                                               MEMORANDUM OPINION* BY
v.        Record No. 0302-23-4              JUDGE STUART A. RAPHAEL
                                               SEPTEMBER 10, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge

Bryan Kennedy, Senior Assistant Public Defender (Gretchen
Schumaker, Assistant Public Defender, on briefs), for appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General; Collin Chayce Crookenden, Assistant
Attorney General, on brief), for appellee.


Zackary Thomas Burkard appeals his two voluntary-manslaughter convictions. Burkard

argues that the trial court should have granted his motion for a new trial based on what he claims

is after-discovered evidence—the testimony of Burkard's friend who was present when Burkard

shot the two victims. But because Burkard knew most of what his friend knew and could have

subpoenaed the friend to testify at trial, the trial court did not abuse its discretion in denying the

new-trial motion. Burkard also claims that the trial court failed to consider mitigating factors

and applied the wrong legal standard when it declined to reduce the jury's recommended

sentence—ten years' imprisonment on each conviction. But the transcript of the sentencing

hearing shows that the trial court considered the mitigating factors and determined that the jury's

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

recommended sentence was fair and appropriate.  Finding no abuse of discretion in either ruling, we affirm the judgment.

BACKGROUND

On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court."  *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so requires that we "discard" the defendant's evidence when it conflicts with the Commonwealth's evidence, "regard as true all the credible evidence favorable to the Commonwealth," and read "all fair inferences" in the Commonwealth's favor.  *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

*A.  The incident*

This case involves a fight between two groups of South County high-school students that began with heckling over social media and ended in Burkard's committing a double homicide. In April 2021, Burkard and his friend, Nicholas Guidinetti, exchanged combative snapchats with Isaiah Stoudemire.  Stoudemire was friends with Ersheen (the first victim) and Calvin (the second victim).[1]  The two groups quarreled over Ersheen's clothes-and-drugs business, the "One Way" organization.  Burkard claimed in social-media posts that One Way peddled low-quality drugs and stolen designs.

On April 24, Burkard posted a video of himself in a car, pointing a handgun at Ersheen's residence.  Guidinetti was in the car with Burkard.  The two of them hurled expletives, taunting Ersheen to "come outside."  Burkard threatened to shoot him "right now."  Burkard also posted a video showing a shotgun, a handgun, and a stash of ammunition.  Burkard can be heard boasting that he was "just waiting" for Ersheen.  Burkard also messaged Stoudemire that "Ur boy gonna

---

[1] We refer to the two minor victims using only first names to protect their privacy.

- 2 -

be 6 feet under." Burkard wrote that he would "curb stomp" Ersheen in the South County High School parking lot. That night, Burkard slept over at Guidinetti's house.

The next day, Ersheen messaged Stoudemire that Guidinetti "kept bothering him" on social media and wanted to fight him. Ersheen had agreed to fight Guidinetti and wanted Stoudemire to "back him up." Their friend, Matt Mulugeta, drove his car to pick them up, and the group then picked up Calvin. No one was armed. The group drove to Guidinetti's house but parked several houses away. Walking toward the house on foot, they encountered Guidinetti in the driveway, in front of the garage. When Ersheen and his friends entered the garage, Guidinetti walked inside as well, closing the garage door behind him.

Burkard was still in the house and had not yet walked to the garage. But he sent snapchat messages to an acquaintance that "They already here," "They wanna scrap," "We just gonna run they shit," and "Show em a real one way lifestyle."

After Ersheen threw the first punch at Guidinetti in the garage, the two brawled, punching each other before grappling on the floor. Stoudemire testified that he, Calvin, and Mulugeta stood by the garage door as Guidinetti and Ersheen clashed.

Burkard testified that he heard the fight and went down to the garage. He entered the garage through the inner door from the home as Guidinetti and Ersheen were wrestling on the floor. Burkard was holding a handgun, which he aimed at Ersheen. Burkard then took aim at Calvin, Stoudemire, and Mulugeta. They pleaded with Burkard to put down the gun, saying this was a "one-on-one fight" between Ersheen and Guidinetti.

At that point, Ersheen and Guidinetti stopped fighting.  Guidinetti stood up and yelled at everyone to get out of his garage.  As Ersheen was getting up, Burkard shot him.[2]  Ersheen collapsed.  Calvin, Stoudemire, and Mulugeta opened the garage door and fled.  After crossing the street, Stoudemire saw Calvin collapse.  Stoudemire called 911, assuming (correctly) that Calvin had also been shot.  Guidinetti also called 911.

When Fairfax County Police Officer Eric Adams arrived, Calvin was lying face down on the sidewalk.  Seeing that Calvin had been shot twice in the back, Adams began rendering aid.

When Officer Dwayne Daniels arrived, he heard a call for help from down the street.  Daniels and another officer saw Guidinetti walking toward them.  Guidinetti said "there's somebody in my garage bleeding out."

When Daniels reached the garage, Burkard was trying to help Ersheen, who was "lying on the floor in a pool of blood."  Burkard identified himself as the shooter.  Other officers arrived to take care of Ersheen, and Daniels arrested Burkard.

Ersheen died in the garage.  Calvin was declared dead at the hospital.  Autopsies showed that Ersheen died from two gunshot wounds to the chest, and Calvin died from two gunshot wounds to the back.  Officers recovered four shell casings from Guidinetti's residence and a Polymer-80 9mm pistol.  Forensic testing tied the pistol to the shell casings as well as to the bullets that killed Ersheen and Calvin.

### B.  The trial

A grand jury indicted Burkard on two counts of first-degree murder and two counts of using a firearm to commit murder.  A ten-day jury trial began on August 9, 2022.  Stoudemire

---

[2] During Stoudemire's testimony, the Commonwealth introduced without objection a video recorded from inside the home, in the stairwell to the garage, as the incident unfolded.  The record does not identify who made the video.  The video captures undecipherable shouting and someone yelling "Get the f*** out," followed by gunshots about two seconds apart.

testified to the events described above.  The Commonwealth also introduced testimony from the responding officers and medical examiners.  After the Commonwealth rested, the trial court denied Burkard's motion to strike.

Testifying in his own defense, Burkard said that he and Guidinetti had started a "campaign" on Snapchat to convince people to buy drugs from them, instead of from One Way.  Burkard bought the Polymer-80 pistol online.  It "c[ame] in parts" that he assembled.  He said that, "occasionally," a trigger pull would "shoot two bullets instead of one."  Burkard admitted that he posted the snapchat videos of his guns and of himself outside Ersheen's home on April 24.  He did that to "deter" Ersheen and his friends, "intimidate them, and scare them off."

Burkard told a different version from Stoudemire of the garage incident.  Burkard said he stayed out of the garage at first because it was "[Guidinetti's] fight."  But when Guidinetti texted that Ersheen brought three other people with him, Burkard feared they were "plotting something."  Moments later, Burkard heard scuffling and yelling from the garage.  Thinking that Guidinetti needed help, Burkard got his pistol and went to the garage.  When he arrived, Burkard "saw [Guidinetti] on the ground and four people surrounding him."  Burkard testified that Ersheen, Calvin, Mulugeta, and Stoudemire were all "swinging" at Guidinetti, punching and kicking him.  Burkard raised his pistol, telling them to get back.  Burkard said that Calvin, Mulugeta, and Stoudemire backed up, but Ersheen ignored him and kept hitting Guidinetti.  When Burkard turned toward Ersheen, Calvin and Mulugeta "would try to charge at" him, until he pointed the gun at them.  That back-and-forth happened "a few times."

Burkard claimed that Ersheen suddenly charged him and that Calvin and Mulugeta charged him as well.  Pointing the gun at Ersheen, Burkard pulled the trigger.  Then taking aim at Calvin and Mulugeta, who were "still running at [him]," Burkard pulled the trigger again.  Burkard said he knew he had shot Ersheen, but he didn't know if he had shot anyone else.

The trial court denied Burkard's renewed motion to strike. The jury found Burkard guilty of two counts of voluntary manslaughter but acquitted him on both counts of using a firearm in the commission of murder.

## C. Jury sentencing

Burkard elected to have the jury determine his punishment. *See* Code §§ 19.2-295, -295.1. The sentencing phase began after the jury returned its verdict. The Commonwealth called three witnesses: both of Calvin's parents along with Ersheen's father. Burkard introduced three exhibits: his adoption report; a psychological/neurological evaluation from when he was 10 years old; and a psychological/neurological evaluation from when he was 14. Burkard also called five witnesses: two neighbors, his aunt, his foster mother, and a neuropsychologist.[3]

The jury sentenced Burkard to ten years' imprisonment on each voluntary-manslaughter conviction. Both sides waived a presentence report, and the court continued the matter for sentencing.

## D. Burkard's motions for a new trial

Burkard moved for a new trial alleging (among other things) newly discovered evidence in the form of Guidinetti's testimony. At the motions hearing that followed, Guidinetti testified that, when he awoke on April 25, Ersheen wanted to fight him. Guidinetti denied that he and Ersheen had agreed to fight each other. When Ersheen said that he was coming to Guidinetti's home, Guidinetti feared that Ersheen and others were going to "jump" him. Claiming that Ersheen had guns and "could be violent," Guidinetti worried that Ersheen might be armed.

---

[3] The neuropsychologist testified generally about the effects of trauma and in utero drug exposure, but he had not evaluated Burkard.

Contrary to Stoudemire's account, Guidinetti denied that he closed the garage door. Guidinetti said that when he was on the ground fighting Ersheen, he felt "five or six" hands and feet hitting him. By the time Burkard arrived, Guidinetti said he was in a "fetal position" with his hands covering his head while Ersheen, Calvin, Stoudemire, and Mulugeta continued to beat him.

When Guidinetti heard the gunshots, Ersheen was "standing right over" him, three to four feet from Burkard. Guidinetti said that Calvin, who was two to three feet away, was "reaching for his waistband" with one hand and reaching for Burkard's gun with the other.

Guidinetti denied conversing with any police officers at the scene. When pressed, he said he could not recall whether he spoke with Fairfax County Police Officer Matthew Dannemann. Guidinetti did not speak with defense counsel until after the trial, "[s]ometime in October 2022." Guidinetti's mother testified that she refused defense counsel's attempts to speak with Guidinetti before trial, telling defense counsel that she had consulted with an attorney.

Officer Dannemann, who responded to the shooting on April 25, also testified at the hearing. He said that Guidinetti had been detained by the time he arrived. After giving *Miranda*[4] warnings, Dannemann spoke with Guidinetti in the back of a police cruiser. At the hearing, the Commonwealth played about ten minutes of the conversation as recorded by Dannemann's body camera. The Commonwealth produced the video in discovery, but the video was not introduced as an exhibit and is not in the record. The portion played at the hearing was not transcribed.

Burkard argued that Guidinetti's testimony was after-discovered evidence that justified granting him a new trial because the defense did not have it at trial. Defense counsel acknowledged that he had not subpoenaed Guidinetti for trial but argued that diligence does not

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

require subpoenaing a witness whose testimony is unknown. The Commonwealth countered that Burkard knew what Guidinetti would have testified to based on the 911 call and his recorded statements to Officer Dannemann. The Commonwealth also argued that Guidinetti's testimony was not material but rather cumulative, corroborative, or collateral.

The trial court denied the new-trial motion. The court found that Burkard had failed to show that he could not have secured Guidinetti's trial testimony by the exercise of reasonable diligence. Rather, counsel's decision not to press for Guidinetti's testimony "was at most a tactical choice." Counsel "did not exhaust avenues open to secure this testimony, such as seeking to speak with Guidinetti's lawyer or forcing the witness's availability at trial through a subpoena." The trial court further found that "Guidinetti's testimony lack[ed] sufficient credibility" to order a new trial. And even if the jury "disregarded" Stoudemire's testimony, the court ruled, the remaining evidence sufficed to convict Burkard of voluntary manslaughter.[5]

### E. Burkard's sentence by the court

At the sentencing hearing, the trial court said that "there [was] no prescribed way to look at whether to suspend a portion of the jury verdict." The court explained that the jury had "ascertained punishment" and that the court "ha[d] to decide whether there [were] reasons to deviate from" that punishment. The trial court viewed the jury's sentence alongside the evidence and considered whether that sentence was "unfair" or disproportional to the crimes. After weighing "punishment, rehabilitation, and incapacitation," the trial court found that the jury's

---

[5] The trial court also denied Burkard's new-trial motions based on (1) the allegedly new testimony of a different witness and (2) the Commonwealth's alleged failure to satisfy its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). Burkard does not assign error to those rulings.

sentence was fair. Thus, the trial court did not "find sufficient cause to deviate from the jury [sentence]."

Burkard noted a timely appeal.

ANALYSIS

Burkard argues that the trial court erred in failing to grant a new trial and in failing to reduce the prison sentence recommended by the jury.

*A. Motion for new trial*

Courts act "with great reluctance" before granting a new trial based on after-discovered evidence. *Avent v. Commonwealth*, 279 Va. 175, 206 (2010) (quoting *Odum v. Commonwealth*, 225 Va. 123, 130 (1983)). A trial court should grant the motion "only under unusual circumstances after particular care and caution has been given to the evidence presented." *Bondi v. Commonwealth*, 70 Va. App. 79, 92 (2019) (quoting *Orndorff v. Commonwealth*, 279 Va. 597, 601 (2010)). We review a trial court's ruling on a new-trial motion for an abuse of discretion. *Id*.

The standard governing such motions is well-established:

> To warrant a new trial, a party must show that the after-discovered evidence:
>
> (1) appears to have been discovered subsequent to the trial;
>
> (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant;
>
> (3) is not merely cumulative, corroborative or collateral; and
>
> (4) is material, and such as should produce opposite results on the merits at another trial.

*Id.* (quoting *Odum*, 225 Va. at 130). "The moving party must establish each of these mandatory criteria." *Id.* (quoting *Commonwealth v. Tweed*, 264 Va. 524, 529 (2002)). We observed in 2010 that "Virginia courts have used this standard for over 100 years." *Lamm v. Commonwealth*,

- 9 -

55 Va. App. 637, 642-43 (2010) (citing *Thompson v. Commonwealth*, 49 Va. (8 Gratt.) 637, 641 (1851)). The standard is demanding because it stems from "the need for finality." *Whittington v. Commonwealth*, 5 Va. App. 212, 215 (1987). "The opportunity and temptation for fraud [that] accompany a motion for a new trial require that such a motion be approached guardedly." *Id.*

Burkard claims that he meets all four prongs because:

    (1) he did not have "the actual substance of" Guidinetti's testimony until after trial;

    (2) he exercised reasonable diligence by reaching out to Guidinetti and was not required to subpoena him;

    (3) the testimony was not collateral, corroborative, or cumulative because it revealed Guidinetti's communications with Ersheen before the incident and explained what happened in the garage before Burkard entered; and

    (4) Guidinetti's testimony would impeach Stoudemire, the Commonwealth's key witness, whose testimony was essential to showing what happened in the garage.

The trial court found that Burkard failed to prove at least the first, second, and fourth prongs of the four-part test.

The correctness of the trial court's rulings on the first and second prongs suffices to resolve this appeal. *See Avent*, 279 Va. at 206-07 (resolving case on one prong when the Commonwealth conceded the other three); *Lamm*, 55 Va. App. at 643-45 (same); *cf. Bondi*, 70 Va. App. at 93 ("Because appellant did not satisfy the materiality requirement, we do not address the court's other bases for denying the motion."). As to the first prong, the substance of Guidinetti's testimony and affidavit were not "new" to Burkard. It does not matter that Guidinetti did not provide the affidavit or testify until after trial. The evidence must be "new" based on the "substantive information" at issue. *Odum*, 225 Va. at 131.

In *Odum*, for example, the Supreme Court found that the defendant had failed to prove the first prong because he knew the substance of the new witness's testimony by the time of trial. *Id.* Odum was convicted of maliciously attempting to cause bodily injury after he deliberately drove his truck on the highway to menace two people on a motorcycle. *Id.* at 125-26. The

victims identified Odum as their assailant. *Id.* at 127. Odum argued for a new trial after his brother confessed that he was the truck driver. *Id.* at 128. At the hearing on that motion, Odum's mother testified that she had seen the brother on the day of the crime and knew that he was the driver. She further testified to having urged Odum before trial to get his brother to "tell the truth" and admit that he was the driver. *Id.* The Court held that the first prong was not satisfied because Odum "and his mother were armed *before* the trial with the very information [that] surfaced after the trial via the [brother's] 'confession.'" *Id.* at 131 (emphasis added); *see also Yeager v. Commonwealth*, 16 Va. App. 761, 766-68 (1993) (finding that an expert's analysis of handwritten letters admitted at trial was not newly discovered evidence when defendant knew the letters' substance).

Like Odum, Burkard knew before trial the substance of the alleged newly discovered evidence. Burkard knew that Guidinetti could corroborate Burkard's claim that he fired the gun after seeing Guidinetti being assaulted by four people, not just one. For one thing, Burkard claims to have witnessed Guidinetti's being assaulted by all four. Burkard also testified that Guidinetti texted him that four people had arrived to fight him. So Burkard knew firsthand that Guidinetti could support his version of events.

For another thing, Burkard had the audio recording of Guidinetti's 911 call, during which Burkard was only several feet away. Burkard's voice can be heard in the background, and Burkard himself testified at trial that he could hear Guidinetti during the call. Guidinetti told the 911 operator that the shooting happened because Guidinetti had been "jumped" by four people who "wouldn't get off." Guidinetti twice told the 911 operator that it was a "four on one" attack. Burkard and his defense team also had the body-camera footage of Officer Dannemann's conversation with Guidinetti at the crime scene.

- 11 -

We are not persuaded by Burkard's claim that he did not know before trial all the details of Guidinetti's social-media interactions with Ersheen on the morning of the fight. Burkard testified at trial that he knew Guidinetti was communicating with Ersheen and Stoudemire that morning and the night before. Burkard had spent the night at Guidinetti's house. And Burkard testified that Guidinetti was "mad" and "not happy with whatever the conversation was." Burkard acknowledged that he "could kind of tell how the conversation was going" before Guidinetti told Burkard "they were coming." Burkard also said he knew "it was [Guidinetti's] fight."

Just like Odum, Burkard was "armed before the trial with the very information" in the alleged newly discovered evidence. *Odum*, 225 Va. at 131. So the trial court did not err when concluding that Burkard's motion failed at the first prong of the analysis.

Nor did the trial court err in finding under the second prong that Burkard failed to exercise reasonable diligence to obtain Guidinetti's testimony for use at trial. What constitutes "reasonable diligence depends upon the facts and circumstances of each particular case." *Orndorff v. Commonwealth*, 271 Va. 486, 502 (2006). The movant bears the burden "to show . . . that he has exercised . . . reasonable diligence . . . and that such diligence did not reveal the existence of, nor show the probability of the existence of, the evidence now relied upon." *Id.*

Just as Odum could have subpoenaed his mother to testify that his brother drove the truck that menaced the motorcycle riders, *Odum*, 225 Va. at 131, Burkard could have subpoenaed Guidinetti. Failing to subpoena a witness who is known to possess exculpatory information is a failure to exercise reasonable diligence. *See, e.g.*, *Mundy v. Commonwealth*, 11 Va. App. 461, 483 (1990) (en banc) ("No explanation is provided for why such witnesses were not subpoenaed to testify at trial."); *Bagley v. Commonwealth*, 73 Va. App. 1, 23 (2021) ("[A]ppellant was on notice that Officer Earlenbaugh might have knowledge of relevant facts. Despite this notice, the

- 12 -

appellant did not request a subpoena for Earlenbaugh for the suppression hearing."). Although Guidinetti moved to Maryland after the shooting, Burkard still could have subpoenaed him for trial. *See* Code § 19.2-277; Md. Cts. & Jud. Proc. Code Ann. § 9-302.

We disagree with Burkard that his failure to subpoena Guidinetti is excused under *Gatling v. Commonwealth*, 14 Va. App. 60 (1992). The defense lawyer there was repeatedly rebuffed in his efforts to interview a material witness. Although the witness was available at trial, we said "it is unreasonable to require, as an exercise of due diligence, that defense counsel call to the witness stand a witness as to whose testimony he is uninformed." *Id.* at 63. As shown above, however, Burkard was not "uninformed" about what Guidinetti would say. Like Odum, Burkard knew the substance of Guidinetti's testimony and could have subpoenaed him.[6]

### B. Sentencing

Burkard elected to have the jury sentence him in this case. *See* Code § 19.2-295; *Bland-Henderson v. Commonwealth*, 303 Va. 212, 218 (2024) ("Code § 19.2-295 provides that a criminal defendant who is found guilty in a jury trial shall be sentenced by the court, unless the defendant has requested jury sentencing."). When a defendant requests to be sentenced by the jury, "a separate proceeding limited to the ascertainment of punishment" is held after a finding of guilt. Code § 19.2-295.1. In that proceeding, the Commonwealth may present victim-impact testimony and other evidence in its case-in-chief, and the defendant "may introduce relevant, admissible evidence related to punishment." *Id.*

The jury's sentence "is subject to the judge's review after considering at the sentencing hearing various mitigating, extenuating, or even aggravating circumstances." *Swain v.*

---

[6] We thus need not reach whether Burkard's counsel also failed to exercise reasonable diligence by not trying to speak with Guidinetti directly (or with Guidinetti's lawyer, if Guidinetti had one) after his mother told counsel before trial that he would not talk about the case.

*Commonwealth*, 28 Va. App. 555, 561 (1998). We review a trial court's sentencing decision for an abuse of discretion. *Cellucci v. Commonwealth*, 77 Va. App. 36, 45 (2023) (en banc); *Bell v. Commonwealth*, 18 Va. App. 146, 148 (1994) ("[T]he decision of a trial judge to impose the jury's sentence in the face of mitigating circumstances will not be overturned absent a clear showing of abuse of discretion."). When "a sentence imposed is within the statutory limits fixed by the legislature, the assumption is that the sentence will not be disturbed on appeal." *Cellucci*, 77 Va. App. at 48 (quoting *Bassett v. Commonwealth*, 13 Va. App. 580, 582 (1992)). And "[b]arring clear evidence to the contrary, this Court will not presume that a trial court purposefully ignored mitigating factors in blind pursuit of a harsh sentence." *Id.* at 51 (quoting *Bassett*, 13 Va. App. at 584).

Burkard claims that the trial court disregarded his mitigating evidence and applied the incorrect legal standard, pointing to the trial court's statement that "the jury verdict is not unfair." But Burkard plucks that one line from over eight transcript pages in which the trial judge thoroughly explained his reasoning. We do not "fix[] upon isolated statements of the trial judge taken out of the full context in which they were made[], and us[e] them as a predicate for holding [that] the law has been misapplied." *Id.* (second alteration in original) (quoting *Coward v. Wellmont Health Sys.*, 295 Va. 351, 363 n.11 (2018)).

The full context here shows that the court acknowledged much of Burkard's mitigating evidence. The court recognized that Burkard had not been "handed the best chance in life when [he] started." It was as if Burkard found himself on "train tracks that led to this point." His biological parents were addicted to drugs, so he "started [his] life in utero, . . . having been affected by drugs," and "that may have a lot to do with why we're here today." Yet Burkard had been given "a second chance," with adoptive parents who were "wonderful people," indeed, "angels." The trial court acknowledged that Burkard had suffered "another setback" when his

adoptive father died and his adoptive mother was injured, which "upset everything." Still, his adoptive mother had "certainly done everything that a mother could humanly do possible to divert [Burkard] from [his] course of action."

As for whether to reduce the jury's recommended sentence, the trial judge said there was "no prescribed way to look at whether to suspend a portion of a jury verdict." His approach was to ask whether "with everything considered, everything I've heard here today, everything I've thought about, is the [sentence] unfair, is it disproportional to the crime committed." The judge said this case involved a "very unique set of circumstances." The court's responsibility was "to look over the jury's shoulder but not to supplant the jury and ignore them altogether." Taking account of "everything considered," the trial judge said there was not "sufficient cause to deviate from the jury [sentence]." In other words, "the jury [sentence] is not unfair, it's a fair [sentence]."[7]

We disagree with Burkard that this case is closer to *Bruce v. Commonwealth*, 9 Va. App. 298 (1990). We reversed the trial court's sentencing decision there because the trial court thought it had "no right" to disagree with the jury's sentence "unless it is outside of the scope of the law so as to be shocking to the conscience." *Id.* at 302. The trial court thus failed "to consider whether a jury sentence should be mitigated" because the court harbored an erroneous "belief that the jury sentence is inviolable." *Id.* We emphasized the trial court's "obligation to temper the jury's sentence, short of granting a new trial, when warranted by mitigating evidence." *Id.*

---

[7] Burkard also says that the trial court "blamed Mr. Burkard for 'cho[osing] the jury'" to sentence him. We don't read the transcript that way. The court simply acknowledged the case at hand and commended the attorneys in the case: "The accused chose the jury and his lawyers did an excellent job both in defense and presenting sentencing information."

The trial court here did what it was supposed to do under *Bruce*. Having considered "everything," including the mitigating evidence offered by Burkard, the court determined that the jury's recommended sentence was "fair." We see no abuse of discretion in that ruling.

CONCLUSION

The trial court did not abuse its discretion by denying Burkard's new-trial motion because Guidinetti's testimony was not newly discovered. Burkard knew the substance of that testimony before trial and failed to exercise reasonable diligence to subpoena Guidinetti's attendance at trial. Nor did the trial court abuse its discretion by imposing the jury's recommended sentence.

*Affirmed.*