# COURT OF APPEALS OF VIRGINIA

**Record No. 1709-24-2**

JOSHUA MAURICE COUSINS

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Causey, Chaney and White

Opinion Issued April 14, 2026[*]

## FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Edward A. Robbins, Jr., Judge

(Gregory R. Sheldon; BainSheldon, PLC, on brief), for appellant.

(Jason S. Miyares,[1] Attorney General; Justin B. Hill, Assistant Attorney General, on brief), for appellee.

## MEMORANDUM OPINION
## PER CURIAM

A jury convicted Joshua Maurice Cousins of first degree murder, malicious wounding, conspiracy to commit burglary, robbery, abduction, burglary, and use of firearm in commission of a felony (five counts). The trial court sentenced him to 100 years' incarceration, with 20 years suspended. On appeal, Cousins argues that the trial court erred in denying his motion to suppress evidence. He also challenges the sufficiency of the evidence to sustain his convictions. Finally, he claims that the trial court should have granted a new trial based on evidence discovered after the trial. Finding no error, we affirm the trial court's judgment.[2]

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] After examining the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the dispositive issue or issues have been authoritatively

BACKGROUND[3]

David Crostic and his girlfriend, Dawn Lyman, lived with Crostic's elderly parents in a house in Chesterfield. When Crostic's parents passed away, Crostic inherited "a few hundred thousand" dollars.[4] Rather than deposit the money in a bank account, Crostic opted to store about approximately $200,000 in cash in multiple safe boxes in the house.

Cousins[5] worked for Crostic's construction business and the two were friends. Cousins also occasionally sold cocaine to Crostic for personal use. Crostic boasted to "everybody," including Cousins, about the amount of cash he had. Cousins even accompanied Crostic when he initially withdrew some of the cash. Cousins told Kanavis Davis, Jimmy Wilson, and Dayomic Smith[6] about the large sum of cash in Crostic's house. They planned to rob Crostic.[7]

On the morning of January 15, 2020, between 10:00 a.m. and noon, Cousins communicated with Davis through text messages and phone calls to set their plan in motion. Wilson drove his

_____

decided, and the appellant has not argued that the case law should be overturned, extended, modified, or reversed." Code § 17.1-403(ii)(b); Rule 5A:27(b).

[3] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

[4] The record suggests that there was some dispute between Crostic and his family about the distribution of his father's estate. Distribution of the estate is unrelated to the issues on appeal.

[5] The record intermittently refers to Cousins by the nickname "Moe."

[6] Smith is also known as "D-Boy," and is referred to by that name throughout the record. Wilson called Smith "The Professional" throughout his testimony.

[7] Cousins initially approached Davis with the information about Crostic's money and the idea to rob him. Cousins did not know Wilson before they conspired to rob Crostic. Davis was a mutual acquaintance between Cousins and Wilson. Likewise, Wilson and Davis did not know Smith before the robbery. Smith was an acquaintance of Cousins.

girlfriend's blue Dodge minivan over to pick up Davis, and the two of them went to Cousins's house. From there, the three drove the minivan to a Harbor Freight hardware store where they met Smith. Davis went into the store and bought zip ties. Before leaving the store, they all put their cell phones into Smith's car. Cousins got in the driver seat of the minivan and drove to Crostic's house.

When they arrived at Crostic's house, Wilson, armed with a revolver, went to the front door holding a red bag as if delivering pizza. Although Lyman initially ignored the doorbell when Wilson rang it, he knocked persistently, so Lyman went to the door and told Wilson he had the wrong address. Wilson insisted he "had something for Mr. and Mrs. Crostic," and he "pushed the door open." Smith got out of the van with a gun and followed Wilson into the house. Davis remained in the van while Cousins turned the van around, repositioning to make a quick getaway.

Inside Crostic's house, Wilson and Smith ordered Crostic and Lyman to get on the ground. Smith tried to restrain Lyman with zip ties but was unsuccessful because her wrists were too small. When Crostic refused to get on the ground, Smith hit him in the head with a gun three times. While Crostic was on the ground, Wilson demanded to know "where the safe was." Wilson told Lyman that "if [she] gave him the money he wouldn't kill" her. Lyman escorted Wilson to the bedroom where two lockboxes holding the cash were located and she handed them over to Wilson.

As Wilson and Smith were about to leave, a struggle ensued between Crostic and the intruders. Wilson fired his revolver, shooting Crostic in the head and killing him. Wilson and Smith ran from the house, got into the minivan, and fled with Cousins at the wheel. Lyman, who was still in the bedroom when she heard the gunshot, went to the front window and saw the van drive away, calling 911 as it sped away.

The Chesterfield County Sheriff's Office put out a BOLO notice for the blue minivan. An EMT, riding in the passenger seat of the ambulance responding to Crostic's home, saw the minivan coming toward them on the road, driving in the opposite direction. He took photos of the minivan

with his cellphone as it passed by. At Crostic's house, the police found Crostic's cell phone and a bag of zip ties with a Harbor Freight label on them. From the photos of the van, police determined that it was registered to Angelina Barker, Wilson's girlfriend.[8] Through Barker, the police learned of Wilson's and Davis's involvement and got Wilson's cell phone number.

After obtaining search warrants for Wilson and Crostic's phone records, investigators cross-referenced the phone numbers found between the two records. Cousins's cell phone number was found in Wilson's and Crostic's phone records. The police also determined Davis's number from Wilson's records and found that Cousins had also been in regular contact with Davis. Once police "identified that Mr. Cousins's phone number was in both Mr. Davis's and Mr. Crostic's records," they obtained a search warrant for Cousins's cell phone records and location data.[9] After reviewing Cousins's cell phone records, they found he had also been in contact with Smith. A few months later, police arrested Cousins at his house.

Before trial, Cousins moved to suppress evidence obtained as a result of the search warrant for his cell phone records. Cousins argued that the affidavit supporting the warrant lacked probable cause and was facially deficient. He further argued that the good-faith exception to the exclusionary rule did not apply because the affidavit provided no nexus between Cousins, his cell phone number, and Crostic's murder. The trial court found that "under a totality of the circumstances test," the warrant was "supported by probable cause," and denied Cousins's motion. Furthermore, the trial court found that, even if the warrant was deficient, the warrant was executed in good faith.

---

[8] Angelina Barker was charged as an accessory after the fact. At the outset, Barker had informed her father that Wilson showed up at her home covered in blood with a bunch of cash. Barker initially refused to contact the police about it though. Barker's father contacted the police and disclosed the information Barker relayed to him.

[9] Investigators used a similar process to determine Smith's cell phone number.

At trial, Davis testified that Cousins approached him with the scheme to rob Crostic. Davis said he initially declined to be involved, but Cousins was persistent about the idea. Davis also said that Cousins had solicited Wilson's help in the scheme. Davis recalled all four of the conspirators placing their cell phones in Smith's car before leaving the Harbor Freight store.

Wilson testified that he took Barker's van to meet Cousins and Davis on the morning of the planned robbery. Wilson believed they would be recovering a debt owed to Cousins; he was not sure exactly what they had planned for that morning, but he "partnered" with Cousins and Davis for the "gig" anyhow. Wilson recounted the course of events during the robbery. He said Cousins handed him the red bag and he went to the front door. He carried his revolver into the house with him. Smith ran into the house behind him armed with a gun and zip ties. He recalled struggling with Crostic, then shooting and killing him.

Barker testified that Wilson asked to use her van "to do a job," and then left their house with a gun on the morning of the robbery. Wilson returned later that day, "frantic," and carrying a different gun. Wilson threw a "bunch of money" on the bed and said he killed someone. He told her Davis, and two other people he did not know, were involved. Eventually, she gave police Wilson's phone number.

Detective Clayton testified to cross-referencing Wilson's phone records with Davis's and Crostic's phone records to identify Cousins's cell phone number. An investigator who specializes in analyzing cell site data testified that the cell phones belonging to Wilson, Davis, Smith, and Cousins were in the area of the Harbor Freight store simultaneously at the time of the robbery.

The Commonwealth argued to the jury that Cousins "was the mastermind behind the plan" to rob Crostic. Though Cousins "didn't pull the trigger," the Commonwealth asked the jury to convict him because he was "directly responsible" for everything that happened. The jury convicted

Cousins of first-degree murder, malicious wounding, conspiracy to commit burglary, robbery, abduction, burglary, and five counts of using a firearm to commit a felony.

Following the trial, Cousins moved for a new trial based on after-discovered evidence. Supposedly before the trial, Davis made exculpatory statements to a former cell mate at Pamunkey Regional Jail, Raymond Hester. According to information that Davis relayed to Hester, Wilson independently knew about Crostic's cash and was the person who set up the robbery. Allegedly, it was Wilson and Davis who went into Crostic's house. And Davis was driving the minivan that day. Incidentally, when Hester was transferred to Riverside Regional Jail he spoke with Cousins after the trial. Cousins said he had been convicted of something he was not involved in. When Cousins explained the situation to Hester, Hester realized that they were crimes that Davis had admitted to him.

At a hearing on the motion, the private investigator for Cousins's defense, Curtis Mullins, testified to his investigation before the trial. Mullins interviewed three inmates at Riverside Regional Jail who had apparently heard information about the case, one of whom spoke directly with Davis. Mullins never came across Hester's name during his investigation. Though Mullins interviewed multiple potential witnesses, he never tried to identify Wilson or Davis's cellmates before trial. The Commonwealth introduced evidence of Hester's more than 20 felony convictions, which included numerous convictions for theft, and a misdemeanor conviction for falsely identifying himself to police.

The trial court found that seven months elapsed from the time that Davis was housed with Hester and the start of trial. Cousins was aware that Davis had been talking to other inmates about the case. And Cousins had been appointed two lawyers and an investigator for his defense. Within the context of a murder trial in which codefendants are cooperating with the prosecution, and the defendant claims to have no involvement whatsoever, the trial court found that

- 6 -

reasonable diligence to secure exculpatory evidence necessitated finding the cooperating codefendants' cellmates and interviewing those individuals before trial. Because "the testimony of Mr. Hester could have been secured for use at trial in the exercise of reasonable diligence," the trial court found it could deny Cousins's motion for a new trial "on that basis" alone. Still, the trial court also found that Hester's criminal record "severely undercuts the evidentiary value of his testimony." Furthermore, Hester's testimony conflicted with trial testimony and the "scientific cell phone and photographic evidence admitted at trial." Thus, Cousins had not proved by clear and convincing evidence that Hester's testimony would have changed the outcome of the trial. The trial court denied Cousins's motion for a new trial. This appeal followed.

ANALYSIS

I. Motion to Suppress Evidence

"In reviewing the denial of a motion to suppress, we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)). "[A] defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review de novo." *Cole v. Commonwealth*, 294 Va. 342, 354 (2017) (quoting *Cost v. Commonwealth*, 275 Va. 246, 250 (2008)). "[W]e give deference to the factual findings of the [trial] court, but we independently determine whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." *Id.* "When challenging the denial of a motion to suppress on appeal, the defendant bears the burden of establishing that reversible error occurred." *Hogle v. Commonwealth*, 75 Va. App. 743, 750 (2022) (quoting *Street v. Commonwealth*, 75 Va. App. 298, 303-04 (2022)).

- 7 -

Cousins argues that the search warrant for his cell phone records lacked probable cause. He asserts that the affidavit supporting the warrant did not explain how Cousins was involved, but rather, "merely asserted that the search warrant was necessary to further the investigation." In support, he highlights language in the affidavit stating, "[t]o further the investigation of the murder of David Crostic it has become necessary to obtain the cell phone records and location data for the cell phone" in question. Cousins claims that "the Commonwealth failed to prove a sufficient nexus between the homicide of David Crostic and the phone number attributed" to Cousins. He adds that the warrant was "nothing more than a fishing expedition," and so lacking in indicia of probable cause that police could not reasonably rely on it in good faith.

Whether probable cause exists "is determined by examining the [totality of the circumstances]." *Anzualda v. Commonwealth*, 44 Va. App. 764, 774 (2005) (quoting *Janis v. Commonwealth*, 22 Va. App. 646, 651 52 (1996)). "[W]hen reviewing the validity of a warrant and its supporting affidavit, the 'magistrate's determination of probable cause should be paid great deference by reviewing courts.'" *Taylor v. Commonwealth*, 66 Va. App. 619, 631 (2016) (quoting *Ward v. Commonwealth*, 273 Va. 211, 218 (2007)). In assessing probable cause, "the magistrate may draw reasonable inferences from the material supplied to him." *Anzualda*, 44 Va. App. at 775. Our review of the sufficiency of an affidavit does "not take the form of de novo review." *Id.* (quoting *Tart v. Commonwealth*, 17 Va. App. 384, 388 (1993)). Instead, we determine "whether the magistrate had a 'substantial basis for . . . concluding that probable cause existed.'" *Gregory v. Commonwealth*, 46 Va. App. 683, 690 (2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)).

The affidavit supporting the warrant alleged the following facts connecting Cousins's phone number to the crime. Crostic was robbed and killed, and Lyman saw a blue van drive away from the scene. Police were led to Barker through photographs of the van. Barker

informed police that Wilson, Davis, and two other men used her van to rob and kill Crostic. She also disclosed Wilson's cell phone number to police. After reviewing records for Wilson's phone, police discovered Davis's cell phone number. When police reviewed Davis's cell phone records, they found that he called Cousins's cell phone at 12:02 p.m. on January 15, 2020, "utilizing a cell tower located at 1500 Midview Road." Wilson's records also reflected an outgoing call at 12:02 p.m. on January 15, 2020, using the same cell tower. Police had previously recovered Crostic's phone from his house and found that his records showed "multiple calls and text messages" with Cousins's cell phone. Furthermore, Crostic's business partner informed police that Crostic had been purchasing cocaine from someone named "Moe," and that Moe drove a red pickup truck. DMV records reflected that a red Chevrolet pickup truck was registered in Cousins's name. From Cousins's DMV photo, police confirmed that "Moe" was Cousins. The affidavit concluded that to "further the investigation of the murder of David Crostic it has become necessary to obtain the cell phone records and location data for the cell phone . . . associated to Joshua Maurice Cousins."

Cousins's argument that the affidavit merely stated that police wanted Cousins's phone records to "further the investigation of the murder of David Crostic" significantly understates the facts alleged to support the warrant. From the alleged facts, the magistrate reasonably could infer that Cousins was communicating with Davis and Wilson shortly before the offense occurred for the purpose of carrying out the robbery. *See Anzualda*, 44 Va. App. at 775 ("the magistrate may draw reasonable inferences from the material supplied"). The affidavit clearly demonstrated a "substantial basis" for the issuing magistrate to conclude that "there is a fair probability that . . . evidence of a crime will be found" in Cousins's cell phone records. *Gates*, 462 U.S. at 238-39. Thus, the trial court did not err in finding that the warrant was supported by probable cause.

The record also supports the trial court's finding that the good faith exception would apply even if the warrant lacked probable cause. When an officer relies on "a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" suppression of evidence is appropriate. *Polston v. Commonwealth*, 255 Va. 500, 503 (1998) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). But "as long as there is some indicia of probable cause in the underlying affidavit, we will apply the good faith exception as long as a reasonable police officer . . . could have believed the warrant was valid." *Anzualda*, 44 Va. App. at 781 (emphasis omitted). As we stated above, the warrant was supported by probable cause. And because "an officer cannot be expected to question the magistrate's probable cause determination," *id.* at 782, it was reasonable for the executing officers to believe the warrant for Cousins's cell phone records was valid. The record supports the trial court's finding that the good faith exception would apply.

## II. Sufficiency of Evidence

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v.*

*Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Cousins argues that the evidence was insufficient to convict him as a principal in the second degree to the acts of Wilson and Smith. He claims that the original plan was "to break into [Crostic's] home and obtain money while no one was home." "Cousins maintains that the homicide, robbery, abduction, breaking and entering, malicious wounding and firearm offenses . . . were not part of the original design." We disagree.

"A principal in the second degree . . . is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005) (quoting *Jones v. Commonwealth*, 208 Va. 370, 372-73 (1967)). "[P]articipation in the commission of the crime is not necessary." *Id.* If the defendant "was present lending countenance, or otherwise aiding while another did the act," he is a principal in the second degree. *Id.*

A conviction as a principal in the second degree requires "some overt act done knowingly in furtherance of the commission of the crime" with the requisite intent. *Thomas v. Commonwealth*, 279 Va. 131, 156 (2010) (quoting *McMorris v. Commonwealth*, 276 Va. 500, 505 (2008)). Generally, a defendant who lacks the intent to commit the resulting crime cannot be found guilty as a principal in the second degree. *Id.* "The one exception exists when there was concert of action and the resulting crime, whether such crime was originally contemplated or not, is a natural and probable consequence of the intended wrongful act." *Id.* (quoting *McMorris*, 276 Va. at 505).

Cousins recruited Davis, Wilson, and Smith to steal from Crostic. By his own account, the plan included breaking into Crostic's home. Before going to Crostic's house, the conspirators met at a hardware store where one of them bought zip ties. After leaving their phones in Smith's car, Cousins drove the group from the store to Crostic's house "[b]ecause he knew where he was going." Wilson and Smith were both armed. When they got to Crostic's house, Cousins handed Wilson the red bag and sent him to the front door armed with a revolver. Cousins did not abandon the plan once they realized that Lyman was home, instead, Smith went into the house with a gun and zip ties while Cousins repositioned the van to facilitate their escape. The jury reasonably could infer that the presence of guns and zip ties in the van demonstrated the conspirators' intent to commit armed robbery and to detain any occupants of the home in the process. *See Cardenas Flores v. Commonwealth*, 84 Va. App. 495, 517 (2025) ("[I]nferences to be drawn from proved facts are within the province of the trier of fact, so long as the inferences are reasonable and justified."). Even if Cousins did not share Wilson and Smith's intent to use firearms, "[t]he evidence warrants the inference that [Cousins] was one of four men, acting in concert, who decided to rob" Crostic. *Carter v. Commonwealth*, 232 Va. 122, 126 (1986). "[A]n incidental probable consequence of such a shared intent was the use of a weapon, including a firearm." *Thomas*, 279 Va. at 159. And "[a]n incidental and probable consequence of the use of a firearm in the commission of a robbery is that someone will get killed." *Jones v. Commonwealth*, 15 Va. App. 384, 389 (1992) (quoting *Carter*, 232 Va. at 126). Thus, the record supports the jury's verdict.

### III. Motion for New Trial Based on After-Discovered Evidence

A motion for a new trial based on after-discovered evidence "is a matter submitted to the sound discretion of the [trial] court." *Bagley v. Commonwealth*, 73 Va. App. 1, 22 (2021) (quoting *Orndorff v. Commonwealth*, 279 Va. 597, 601 (2010) (*Orndorff II*)). Such a motion "will be granted only under unusual circumstances after particular care and caution has been

- 12 -

given to the evidence presented." *Orndorff II*, 279 Va. at 601 (quoting *Orndorff v. Commonwealth*, 271 Va. 486, 501 (2006)); *see also Johnson v. Commonwealth*, 41 Va. App. 37, 43 (2003) ("Motions for new trials based upon after-discovered evidence . . . are awarded with great reluctance." (quoting *Odum v. Commonwealth*, 225 Va. 123, 130 (1983))). The trial court's "decision will not be reversed absent an abuse of discretion." *Johnson*, 41 Va. App. at 43.

Cousins claims that the trial court "applied an unreasonably high standard" in denying his motion for a new trial. He argues that he could not have discovered the existence of Hester's testimony through reasonable diligence. He also claims that Hester's testimony "was material and should have produced a different result on the merits at a new trial." Cousins argues that the "jury should have been able to hear Hester's testimony," because "if believed by the jury, [it] would tend to exonerate him."

"To be entitled to a new trial, the moving party must prove" that the new evidence meets four requirements. *Bagley*, 73 Va. App. at 22; *Odum,* 225 Va. at 130. First, that the evidence "appears to have been discovered [after] the trial." *Id.* (alteration in original). Second, it "could not have been secured for use at trial in the exercise of reasonable diligence." *Id.* Third, it is "not merely cumulative, corroborative or collateral." *Id.* And fourth, it is material and "should produce opposite results on the merits at another trial." *Id.*

The Commonwealth impeached Hester's credibility with proof that he had been convicted of more than 20 felony convictions, which included numerous convictions of moral turpitude. The trial court found that Hester's criminal record "severely undercuts the evidentiary value of his testimony" and that his testimony conflicted with other credible evidence admitted at trial. If "evidence supporting the new trial motion is contradicted by evidence in opposition to the motion, the [trial] court is not permitted to presume that the moving party's evidence is true

*but is required to weigh all the evidence* presented in determining whether the moving party has satisfied" the fourth component of materiality. *Orndorff II*, 279 Va. at 604. Thus, the trial court's "role resembles that of a fact finder in determining whether the evidence is such that it should produce an opposite result on the merits at a new trial." *Id.* at 604-05. Though Hester's testimony, *if believed*, might produce a different result, "the trial court, assessing the credibility of . . . witnesses both at trial and at the motion hearing, properly could find that it was not such as should produce opposite results on the merits at another trial." *Odum*, 225 Va. at 131.

The trial court denied Cousins's motion on a lack of reasonable diligence and materiality. As stated above, the trial court "did not abuse its discretion in finding that the evidence was immaterial and therefore did not warrant a new trial." *Bondi v. Commonwealth*, 70 Va. App. 79, 93 (2019). "Because appellant did not satisfy the materiality requirement, we do not address the [trial] court's other bases for denying the motion." *Id.*; *see also Commonwealth v. White*, 293 Va. 411, 419 (2017) ("[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available'" (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015))).

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*